

SIDLEY AUSTIN LLP
1501 K STREET, N.W.
WASHINGTON, D.C. 20005
+1 202 736 8000
+1 202 736 8711 FAX

AMERICA • ASIA PACIFIC • EUROPE

+1 202 736 8020
SHAWN.HIGGINS@SIDLEY.COM

June 30, 2026

**PUBLIC VERSION**

**FILED ELECTRONICALLY**

The Honorable Gina Justice
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

      Re:     Nippon Steel Corporation v. United States, Court No. 26-00747

Dear Ms. Justice:

On behalf of Nippon Steel Corporation ("NSC"), plaintiff in the above-captioned proceeding, we hereby file NSC's Rule 56.2 Motion for Judgment on the Agency Record, Memorandum of Points and Authorities in support thereof, and proposed Order.

Copies of the attached confidential documents have been served on the parties listed in the attached certificate of service.

Pursuant to the "one day lag rule" set out in Rules 5(g) and 73.2(c) of the Rules of this Court, the public version of this brief will be electronically filed on June 30, 2026, one business day after the date of this filing. In addition, copies of the public version of the attached documents will be served on the same day on the parties listed in the attached certificate of service.

# SIDLEY

The Honorable Gina Justice
June 30, 2026
Page 2

Please do not hesitate to contact the undersigned if you have any questions regarding this matter.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Ashlande Gelin
Lloyd Lyall
Danielle V. Cossey

Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8329
shawn.higgins@sidley.com

*Counsel to Plaintiff,*
*Nippon Steel Corporation*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION,<br><br>                                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                                    Defendant,<br><br>CLEVELAND-CLIFFS INC.,<br><br>UNITED STATES STEEL CORPORATION,<br><br>                                    Defendant-Intervenors. | Court No. 26-00747 |

**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Nippon Steel Corporation hereby submits this Motion for Judgment on the Agency Record with regard to Counts One, Two and Three set forth in its First Amended Complaint filed on March 12, 2026.[1]   This action challenges the final results issued by the U.S. Department of Commerce in the first administrative review of Non-Oriented Electrical Steel from Japan, Case No. A-588-872.   *See Non-Oriented Electrical Steel From Japan: Final Results of Antidumping Duty Administrative Review: 2022-2023*, 90 Fed. Reg. 59501 (Dec. 19, 2025).   In an order dated April 30, 2026, the Court directed that dispositive motions be filed by today's date.

For the reasons set forth in the accompanying Memorandum of Points and Authorities, Plaintiff hereby moves that the Court grant this motion for judgment on the agency record.

---

[1]     Plaintiff is no longer pursuing Count Four of the First Amended Complaint.

A proposed order is attached.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Ashlande Gelin
Lloyd Lyall
Danielle V. Cossey


Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8329
shawn.higgins@sidley.com

*Counsel to Plaintiff,*
*Nippon Steel Corporation*

June 30, 2026

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION,<br><br>                                    Plaintiff,<br><br>        v.<br><br>UNITED STATES,<br><br>                                    Defendant,<br><br>CLEVELAND-CLIFFS INC.,<br><br>UNITED STATES STEEL CORPORATION,<br><br>                        Defendant-Intervenors. | Court No. 26-00747<br><br>**PUBLIC VERSION**<br><br>**Business Proprietary Information Has Been Removed in the Table of Contents and on pages 6-10, 17-19, 26-30** |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000

June 30, 2026                                  Counsel to Nippon Steel Corporation

**TABLE OF CONTENTS**

RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT ................................................. 1

I.     Administrative Determination of Which Review Is Sought .................................................... 1

II.    Issues Presented and Summary of the Argument ........................................................ 2

    A.     The Department's Finding That NSC Is Affiliated With the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ...................................................................................................................... 2

    B.     The Department's Use of FA and AFA With Respect to Downstream Sales Information from the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ............................................. 3

    C.     The Department's Use of AFA With Respect to NSC's U.S. Sales Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law .......................................... 4

STATEMENT OF FACTS ............................................................................................................. 5

STANDARD OF REVIEW ........................................................................................................... 10

ARGUMENT ................................................................................................................................. 11

I.     The Department's Finding That NSC Is Affiliated With the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ............ 11

    A.     The Department's Affiliation Theory Required Evidence That NSC Could Control the Unaffiliated Trading Companies ..................................................................................... 11

    B.     The Department's Theory that NSC Controls the Unaffiliated Trading Companies Based on a Principal-Agent Relationship Fails Because the Factors of the Principal-Agent Test Do Not Evidence NSC's Control ..................................................................................... 16

        1.     Price and Other Terms of Sale Did Not Show that NSC Controlled the Unaffiliated Trading Companies Because NSC Did Not Arrange or Set the Final Invoiced Price or Terms Between the Unaffiliated Trading Companies and End Customers .......................... 16

        2.     NSC's Negotiations and Interactions With Downstream Customers Were Necessary for the Market and Not Indicative of an Agency Relationship ............................................. 18

        3.     Sales Documentation and Contract Provisions Did Not Give NSC Control Over Downstream Resales by the Unaffiliated Trading Companies ............................................. 18

        4.     Inventory, Processing, Title, and Risk Showed the Unaffiliated Trading Companies Acted as Purchasers and Resellers .................................................................................. 19

        5.     The Remaining Record Evidence Does Not Show Any Other Mechanism Through Which NSC Controlled the Unaffiliated Trading Companies ............................................. 20

II.    The Department's Use of FA and AFA With Respect to Downstream Sales Information from the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law .................................................................................. 21

    A.     The Statute Requires the Department To Make Separate Findings Before Using FA and AFA ................................................................................................................................ 22

    B.     For Requested Downstream Resale Information, the Department Could at Most Use

FA, Not AFA .............................................................................................................. 23

    C.      For Downstream Resale Information the Department Never Requested, the Department Could Use Neither FA Nor AFA ............................................................................. 26

III.    The Department's Use of AFA With Respect to NSC's U.S. Sales Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law ........................................... 27

    A.      The Statute Requires the Department To Identify Any Deficiency Before Using FA or AFA, and Otherwise Use Submitted Information That Meets the Statutory Criteria ............... 28

    B.      The Department Could Not Reject **[**       **]** U.S. Sales Database Without First Identifying a Deficiency and Providing an Opportunity To Remedy or Explain ..................... 29

    C.      The Department Had To Use **[**       **]** U.S. Sales Database Because the Statutory Criteria for Using Submitted Information Were Met ................................................ 30

IV.    CONCLUSION ................................................................................................................... 31

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asociacion Colombiana de Exportadores de Flores v. United States*,
704 F. Supp. 1114 (Ct. Int'l Trade 1989), *aff'd*, 901 F.2d 1089 (Fed. Cir. 1990) ................................................................................................................11

*Baroque Timber Indus. (Zhongshan) Co. v. United States*,
766 F. Supp. 3d 1296 (Ct. Int'l Trade 2025) ...........................................................28

*Bio-Lab, Inc. v. United States*,
433 F. Supp. 3d 1287 (Ct. Int'l Trade 2020). ...................................................15, 18

*BlueScope Steel Ltd. v. United States*,
548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ...........................................................28

*Carpenter Tech. Corp. v. United States*,
34 CIT 1482, 2010 WL 4870570 (2010) .................................................................15

*Chia Far Indus. Factory Co. v. United States*,
343 F. Supp. 2d 1344 (Ct. Int'l Trade 2004) ...........................................................15

*China Steel Corp. v. United States*,
264 F. Supp. 2d 1339 (Ct. Int'l Trade 2003) ...........................................................12

*Hyundai Steel Co. v. United States*,
518 F. Supp. 3d 1309 (Ct. Int'l Trade 2021) ...........................................................28

*Jinko Solar Import & Export Co. v. United States*,
701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ...........................................................24

*Matsushita Elec. Indus. Co. v. United States*,
750 F.2d 927 (Fed. Cir. 1984)..................................................................................11

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*,
753 F.3d 1227 (Fed. Cir. 2014)..........................................................................22, 27

*Mukand, Ltd. v. United States*,
767 F.3d 1300 (Fed. Cir. 2014)................................................................................25

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003)................................................................................23

*Risen Energy Co., Ltd. v. United States*,
724 F. Supp. 3d 1356 (Ct. Int'l Trade 2024) ...........................................................30

*Saha Thai Steel Pipe Public Co. v. United States*,
  605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) ...........................................28

*Shandong Huarong Mach. Co. v. United States*,
  435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ..........................................15

*Shelter Forest International Acquisition, Inc. v. United States*,
  Slip Op. 26-5, 2026 WL 413045 (Ct. Int'l Trade Jan. 28, 2026) ............28

*Target Corp. v. United States*,
  609 F.3d 1352 (Fed. Cir. 2010)...........................................................11, 13

*Zhejiang DunAn Hetian Metal Co. v. United States*,
  652 F.3d 1333 (Fed. Cir. 2011)...............................................................22

**Statutes and Regulations**

19 U.S.C. § 1516a(b)(1)(B)(i)....................................................................10

19 U.S.C. § 1677(33) .............................................................................2, 12

19 U.S.C. § 1677(33)(G).........................................................................2, 12

19 U.S.C. § 1677e ..................................................................................3, 22

19 U.S.C. § 1677e(a)..............................................3, 4, 5, 22, 26, 27, 28

19 U.S.C. § 1677e(b) ........................................................4, 22, 25, 26

19 U.S.C. § 1677m(d) ...............................................5, 27, 28, 30, 31

19 U.S.C. § 1677m(e) ...............................................5, 27, 28, 30, 31

19 C.F.R. § 351.102(b)(3)........................................................................2, 12

**Administrative Decisions**

*Chlorinated Isocyanurates From the People's Republic of China*; 2017-2018,
  85 Fed. Reg. 10411 (Feb. 24, 2020) ........................................................14

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan; Final
  Results of Antidumping Duty Administrative Review*; 2015-2016,
  82 Fed. Reg. 57715 (Dec. 7, 2017) ..........................................................13

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  89 Fed. Reg. 8641 (Feb. 8, 2024) ...............................................................5

*Non-Oriented Electrical Steel From Japan: Preliminary Results of Antidumping*
    *Duty Administrative Review*; 2022-2023,
    90 Fed. Reg. 15447 (Apr. 11, 2025) ...........................................................................9

*Non-Oriented Electrical Steel From Japan: Final Results of Antidumping Duty*
    *Administrative Review 2022-2023,*
    90 Fed. Reg. 59501 (Dec. 19, 2025) ................................................................. *passim*

*Notice of Final Determination of Sales at Less Than Fair Value: Engineered*
    *Process Gas Turbo-Compressor Systems, Whether Assembled or*
    *Unassembled, and Whether Complete or Incomplete, From Japan,*
    62 Fed. Reg. 24394 (May 5, 1997) ............................................................................12

*Refillable Stainless Steel Kegs From the People's Republic of China: Final*
    *Results of the Antidumping Duty Administrative Review*; 2019-2020,
    87 Fed. Reg. 40784 (Jul. 8, 2022) ............................................................................14

*Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative*
    *Review,*
    74 Fed. Reg. 47198 (Sept. 15, 2009) ........................................................................14

*Stainless Steel Sheet and Strip in Coils From Taiwan: Final Results and Partial*
    *Rescission of Antidumping Duty Administrative Review,*
    67 Fed. Reg. 6682 (Feb. 13, 2002) ...........................................................................12

*Steel Threaded Rod from India: Final Determination of Sales at Less Than Fair*
    *Value and Final Determination of Critical Circumstances, in Part*; 2012-
    *2013,*
    79 Fed. Reg. 40714 (July 14, 2014) ..........................................................................20

*Steel Threaded Rod from India: Preliminary Determination of Sales at Less Than*
    *Fair Value, Affirmative Preliminary Determination of Critical Circumstances,*
    *in Part, and Postponement of Final Determination,*
    79 Fed. Reg. 9164 (Feb. 18, 2014) ...........................................................................20

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION, | Court No. 26-00747 |
| Plaintiff, | **PUBLIC VERSION** |
| v. | **Business Proprietary Information Has Been Removed in the Table of Contents and on pages 6-10, 17-19, 26-30** |
| UNITED STATES, | |
| Defendant, | |
| CLEVELAND-CLIFFS INC., | |
| UNITED STATES STEEL CORPORATION, | |
| Defendant-Intervenors. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Plaintiff Nippon Steel Corporation ("NSC") submits this Memorandum of Points and Authorities in Support of Motion for Judgment on the Agency Record, regarding Counts One, Two and Three of its First Amended Complaint.[1]  For the reasons below, NSC respectfully requests that the Court reverse the challenged determination of the U.S. Department of Commerce ("Department") and remand with instructions to recalculate NSC's dumping margin.

**RULE 56.2 STATEMENT AND SUMMARY OF ARGUMENT**

**I.     Administrative Determination of Which Review Is Sought**

NSC seeks review of the final results of the first administrative review ("AR1") of the antidumping duty ("AD") order on Non-Oriented Electrical Steel ("NOES") from Japan. The period of review ("POR") for AR1 covered December 1, 2022, through November 30,

---

[1]     Plaintiff is no longer pursuing Count Four of the First Amended Complaint.

2023. The Department published the final results in *Non-Oriented Electrical Steel From Japan: Final Results of Antidumping Duty Administrative Review: 2022-2023*, 90 Fed. Reg. 59501 (Dec. 19, 2025) ("*Final Results*"), P.R. 175, in which the Department calculated a dumping margin of 47.80 percent for NSC. The Department's analysis is contained in: "Issues and Decision Memorandum for the Final Results of the Administrative Review of the Antidumping Duty Order on Non-Oriented Electrical Steel from Japan; 2022-2023," Dec. 15, 2025 ("IDM"), P.R. 174; Memorandum entitled "Final Analysis Memorandum," Dec. 15, 2025 ("Final Analysis Memo"), P.R. 177, C.R. 209; and Memorandum entitled "BPI Memorandum," Dec. 15, 2025 ("BPI Memo"), P.R. 176, C.R. 208.

## II.    Issues Presented and Summary of the Argument

This memorandum addresses three issues (along with sub-issues) regarding the Department's calculation of NSC's dumping margin and associated use of facts available ("FA") and adverse facts available ("AFA") related to information from certain trading companies that NSC had identified as unaffiliated (hereinafter, the "unaffiliated trading companies") in AR1 of the AD order on NOES from Japan.

### A.    The Department's Finding That NSC Is Affiliated With the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

The Department found that NSC was affiliated with the unaffiliated trading companies under the statute's "control" provision, 19 U.S.C. § 1677(33)(G), based on a principal-agent theory. IDM at Comment 1, P.R. 174. That theory required substantial evidence that NSC was legally or operationally able to restrain or direct the unaffiliated trading companies, particularly in the pricing of their resales to their own customers. 19 U.S.C. § 1677(33); 19 C.F.R. § 351.102(b)(3). However, the Department did not identify any such evidence.

The Department inferred that the unaffiliated trading companies were NSC's agents from

NSC's discussions with end customers about specifications, quantities, production timing, logistics, technical issues, and the FOB price that NSC charged to the unaffiliated trading companies. However, NSC was involved in those discussions because the NOES had to meet the customers' technical and commercial requirements. IDM at Comment 1, P.R. 174. Participation in those discussions was consistent with NSC's role as a producer and seller; those discussions did not show that NSC controlled the unaffiliated trading companies' resales, especially as the only price discussed by NSC was the FOB price it charged the unaffiliated trading companies.

The record instead showed that the unaffiliated trading companies acted as independent purchasers and resellers of NOES in their own right. They bought NOES from NSC, took title, bore risk of loss, held inventory, arranged slitting or delivery, invoiced and collected payment from their own customers, controlled their own resale margins, protected their own customer information, and refused to provide their downstream sales records. The Court should therefore remand for reconsideration the Department's finding that NSC was affiliated with the unaffiliated trading companies based on purported control over those companies.

> **B.** **The Department's Use of FA and AFA With Respect to Downstream Sales Information from the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law**

Even if the Court sustains the Department's finding that NSC was affiliated with the unaffiliated trading companies, that finding did not authorize the Department to apply FA and AFA. The Department still had to satisfy 19 U.S.C. § 1677e. Its determination to apply FA and AFA to purportedly missing downstream sales information raises two distinct issues.

First, for the unaffiliated trading companies from which the Department requested downstream sales information, the Department could use only neutral FA based on 19 U.S.C. § 1677e(a). The Department could not apply AFA under 19 U.S.C. § 1677e(b) unless it also

identified substantial evidence that NSC failed to cooperate to the best of its ability by not putting forth its maximum efforts to obtain the requested downstream resale records.  Here, NSC transmitted the Department's requests to the unaffiliated trading companies, sought cooperation from them, offered support, and placed evidence of those companies' refusals on the record.  The Department faulted NSC for not using purported leverage or incentives, but it did not identify what additional effort NSC failed to undertake that would have produced the unaffiliated trading companies' records.  Hence, the Department had no basis to apply AFA to the missing downstream sales information from the unaffiliated trading companies from which the Department requested such information.

Second, for the unaffiliated trading companies from which the Department never requested home market downstream resale information, the Department did not even have missing requested information under 19 U.S.C. § 1677e(a).  Nor could NSC fail to cooperate under 19 U.S.C. § 1677e(b) by not producing information the Department never requested.  Hence, the Department had no basis to apply FA or AFA in these instances.

The Court should therefore remand with instructions to apply neutral FA, at most, for requested downstream sales information that remains missing; and to apply neither FA nor AFA for downstream sales information the Department never requested.

C.      **The Department's Use of AFA With Respect to NSC's U.S. Sales Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law**

The Department separately erred in applying AFA to NSC's U.S. sales.  NSC had only one unaffiliated trading company customer that purchased NOES from NSC for resale to the U.S. market.  The Department requested "a separate U.S. sales database" reporting this unaffiliated trading company's sales to the first unaffiliated U.S. customer, and this unaffiliated trading company provided that database.

4

The Department nonetheless rejected it because this unaffiliated trading company did not provide a narrative Section C response.  IDM at Comment 2, P.R. 174.  If the Department viewed the missing narrative as a deficiency, 19 U.S.C. § 1677e(a) and 19 U.S.C. § 1677m(d) required the Department to identify that deficiency and provide an opportunity to remedy or explain it before resorting to FA or AFA.  The Department did neither.

Meanwhile, the U.S. sales database submitted by the unaffiliated trading company that handled NSC's NOES exports to the United States was: timely; verifiable; reliable in that it separated NSC's price to the unaffiliated trading company from the unaffiliated trading company's price to the first unaffiliated U.S. customer and reported transaction-specific gross unit prices; provided to the best ability of NSC and the U.S. trading company; and usable without undue difficulty.  Thus, under 19 U.S.C. § 1677m(e), the Department was required to use the submitted information instead of rejecting it and substituting the lowest gross unit price in NSC's U.S. sales database for all U.S. sales.  Final Analysis Memo at 3, P.R. 177, C.R. 209.

## STATEMENT OF FACTS

On February 8, 2024, the Department initiated AR1 of the AD order on NOES from Japan for the POR December 1, 2022, through November 30, 2023.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8641 (Feb. 8, 2024).  The Department issued its AD questionnaire to NSC on April 1, 2024.  Letter from Howard Smith to Nippon Steel Corporation, "Administrative Review of the Antidumping Duty Order on Non-Oriented Electrical Steel from Japan: Request for Information," Apr. 1, 2024 ("AD Questionnaire"), P.R. 22.

NSC responded to the AD Questionnaire and the Department's supplemental requests throughout the review.  The responses most relevant here are: NSC's Section A Questionnaire Response ("NSC's AQR"), P.R. 29-38, C.R. 9-23; NSC's Section B Questionnaire Response

("NSC's BQR"), P.R. 49-50, C.R. 25-36; NSC's Section C Questionnaire Response ("NSC's CQR"), P.R. 51, C.R. 37-42; NSC's Section B Supplemental Questionnaire Response ("NSC's BSQR"), P.R. 87-89, C.R. 101-136; NSC's Supplemental Questionnaire Response ("NSC's SQR"), P.R. 115, C.R. 172-174; NSC's Response to the December 13 Supplemental Questionnaire ("NSC's SQR2"), P.R. 119-120, C.R. 176-178; NSC's Response to the February 13 Request for Information ("NSC's Response to Feb. 13 RFI"), P.R. 135, C.R. 183; NSC's Second Response to the February 13 Request for Information ("NSC's Second Response to Feb. 13 RFI"), P.R. 138, C.R. 185-186; and NSC's Response to the February 21 Supplemental Questionnaire ("NSC's BSQR3"), P.R. 140, C.R. 187-194.

NSC reported home market and U.S. sales through trading companies that NSC identified as unaffiliated, which in turn resold NSC-produced NOES to their own downstream customers:
[



] (collectively, the "unaffiliated trading companies"). NSC's BQR, Exhibit B-11, P.R. 49-50, C.R. 25-36; NSC's CQR, Exhibit C-9, P.R. 51, C.R. 37-42; NSC's SQR at SQR-6 to SQR-13 and Exhibits SQR-1 to SQR-3, P.R. 115, C.R. 172-174; NSC's BSQR3 at BSQR3-1 to BSQR3-6, P.R. 140, C.R. 187-194.

NSC explained that NOES is made for particular end uses, and that NSC therefore discussed technical specifications, grades, quantities, lead times, logistics, technical issues, and supply requirements with end customers. NSC's AQR at A-18 to A-19, A-23, A-26, P.R. 29-38, C.R. 9-23; NSC's BSQR at BSQR-11 to BSQR-12, P.R. 87-89, C.R. 101-136; NSC's CSQR at CSQR-10, P.R. 79, C.R. 88-99. NSC explained that the only price addressed in these discussions was the FOB price that NSC charged the unaffiliated trading companies. NSC's AQR at A-23 to

6

A-24, P.R. 29-38, C.R. 9-23; NSC's CSQR at CSQR-10, P.R. 79, C.R. 88-99; NSC's BSQR3 at BSQR3-2 to BSQR3-4, P.R. 140, C.R. 187-194.

The unaffiliated trading companies performed resale functions for their own customers. Specifically, the unaffiliated trading companies issued resale invoices, collected payment, maintained inventory to meet customer demand, arranged slitting or delivery, and promoted NSC-produced NOES to customers in their own networks. NSC's AQR at A-23, P.R. 29-38, C.R. 9-23; NSC's SQR at SQR-6, SQR-8 to SQR-9, P.R. 115, C.R. 172-174. NSC did not have access to the unaffiliated trading companies' downstream invoices, and the unaffiliated trading companies were not required to report their invoice terms to NSC. NSC's BSQR3 at BSQR3-1, P.R. 140, C.R. 187-194.

For U.S. sales, NSC reported export price ("EP") sales to [        ]. [        ] placed orders with NSC, and title transferred to [        ] when the products were loaded on board at the port of shipment in Japan. NSC's ASQR at ASQR-22 to ASQR-23, P.R. 75-78, C.R. 75-87. NSC reported that [        ] and [                                    ], which served as the U.S. importer of record and direct contracting party with the end customer, were wholly owned subsidiaries of [                    ]; and that NSC was not affiliated with [

                                    ]. NSC's ASQR at ASQR-22 to ASQR-24, P.R. 75-78, C.R. 75-87; NSC's CSQR at CSQR-26, P.R. 79, C.R. 88-99.

On December 13, 2024, the Department requested downstream sales information concerning the unaffiliated trading companies' resales to unaffiliated customers. *See* Letter from Howard Smith to Nippon Steel Corporation, "Supplemental Questionnaire," Dec. 13, 2024 ("Dec. 13 Supplemental Questionnaire"), P.R. 116, C.R. 175. For home market sales, the Department requested a separate database reporting "the sale invoiced by the unaffiliated trading

7

company to the unaffiliated home market customer." *Id*. at 4.  For U.S. sales, the Department requested "a separate U.S. sales database in which NSC reports the sale from the trading company to the first unaffiliated U.S. customer." *Id.*  (emphasis omitted).  NSC responded that the requested downstream sales were sales by the unaffiliated trading companies, not sales by NSC or by NSC affiliates, and the unaffiliated trading companies refused to provide this information to NSC due to concerns related to confidentiality, timing, reputation, and resources.  NSC's SQR2 at SQR2-3 to SQR2-6, P.R. 119-120, C.R. 176-178.

On February 13, 2025, the Department made direct requests to only certain of the unaffiliated trading companies via a letter that was addressed to NSC.  For home market sales, the Department identified [                                        ]; and for U.S. sales the Department identified [        ].  Letter from Howard Smith to Nippon Steel Corporation, "Request for Information," Feb. 13, 2025 ("Feb. 13 RFI"), P.R. 127, C.R. 180.  The Department stated that it was "directly requesting that the 'unaffiliated' trading companies provide the information that Commerce sought from NSC in Commerce's December 13, 2024, supplemental questionnaire." *Id.* at 1.  The Department instructed NSC to forward the request and permitted the unaffiliated trading companies to submit responses directly to the Department, through NSC, or through NSC's counsel. *Id*. at 5.  As instructed, NSC forwarded the Department's request to the unaffiliated trading companies and addressed their confidentiality concerns (by confirming that the unaffiliated trading companies may submit the requested information directly to NSC's counsel), but the unaffiliated trading companies still mostly refused to submit the requested information.   Feb. 13 RFI at 1, 5, P.R. 127, C.R. 180; NSC's Response to Feb. 13 RFI at 1-2 & Exhibit RFI-1-RFI-4, P.R. 135, C.R. 183; NSC's Second Response to Feb. 13 RFI at 1-2 & Exhibit RFI-5-RFI-8, P.R. 138, C.R. 185-186; IDM at Comment 2 & nn.99-103, P.R. 174.

PUBLIC VERSION

However, for U.S. sales, **[            ]** *did provide* the requested U.S. sales database. NSC's Second Response to Feb. 13 RFI, Exhibit RFI-8, P.R. 138, C.R. 185-186.  The database reported transaction-specific sales from **[            ]** to the unaffiliated end customer, gross unit price, NSC's price to **[            ]**, and the difference between **[            ]** net price to the unaffiliated end customer and NSC's price to **[            ]**.  *Id.*

The Department published its preliminary results on April 11, 2025.  *Non-Oriented Electrical Steel From Japan: Preliminary Results of Antidumping Duty Administrative Review*; 2022-2023, 90 Fed. Reg. 15447 (Apr. 11, 2025) ("*Preliminary Results*"), P.R. 149.  The Department preliminarily found that NSC was affiliated with the unaffiliated trading companies through a principal-agent relationship and applied total AFA to NSC.  "Decision Memorandum for the Preliminary Results of the Administrative Review of the Antidumping Duty Order on Non-Oriented Electrical Steel from Japan; 2022-2023," Apr. 7, 2025 ("PDM") at 4-11, P.R. 148; Memorandum entitled "Preliminary Analysis Memorandum," Apr. 7, 2025 at 1-6, P.R. 151, C.R. 203.

NSC submitted its case brief on May 9, 2025.  NSC's Case Brief, P.R. 154, C.R. 204-205.  NSC argued that the unaffiliated trading companies were not affiliated with NSC because, *inter alia*, they maintained inventory, took title, bore risk of loss, arranged processing or delivery, issued invoices, collected payment, controlled their own resale margins, and treated downstream resale information as confidential.  *Id.* at 11-36.  NSC also argued that AFA was unlawful because the requested information belonged to the unaffiliated trading companies, NSC requested and offered assistance in obtaining that information, and the unaffiliated trading companies refused to provide the information.  *Id*. at 36-53.  For U.S. sales, NSC argued that **[            ]** provided the separate U.S. sales database the Department had requested, and that

9

PUBLIC VERSION

any perceived narrative deficiency required notice and an opportunity to remedy or explain. *Id*. at 53-58.

In the *Final Results*, the Department continued to find that NSC was affiliated with the unaffiliated trading companies based on a principal-agent theory. *Final Results*, 90 Fed. Reg. 59501, P.R. 175; IDM at Comment 1, P.R. 174. This time, the Department applied partial AFA. For home market sales, it applied a gross unit price of **[        ]** yen to all sales through the unaffiliated trading companies, regardless of whether the Department had requested downstream resale information from the company. Final Analysis Memo at 2, P.R. 177, C.R. 209. For U.S. sales, it applied the lowest gross unit price of **[        ]** reported in NSC's U.S. sales database to all U.S. sales. *Id*. at 3.

The Department's *Final Results* – including the finding that NSC is affiliated with the unaffiliated trading companies, the application of FA and AFA to downstream sales information from the unaffiliated trading companies, and the rejection of the U.S. sales database submitted by the unaffiliated trading company that handled NSC's NOES exports to the United States – are challenged in this action.

## STANDARD OF REVIEW

The Court "shall hold unlawful" the Department's determination if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), and *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)). "Speculation" is not substantial evidence. *Asociacion Colombiana de Exportadores de Flores v.*

*United States*, 704 F. Supp. 1114, 1117 (Ct. Int'l Trade 1989), *aff'd*, 901 F.2d 1089 (Fed. Cir. 1990). The Court considers "the record as a whole, including any evidence which fairly detracts from the weight" of the Department's conclusion. *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010) (internal quotation marks and citation omitted).

## ARGUMENT

### I.    The Department's Finding That NSC Is Affiliated With the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

The Department's finding that NSC is affiliated with the unaffiliated trading companies should be remanded because, in the *Final Results*, the Department incorrectly determined that NSC's control over its initial sale to the unaffiliated trading companies was evidence of its control over the unaffiliated trading companies' downstream resale to their own customers. In fact, there is no evidence that NSC could restrain or direct the downstream resale. The unaffiliated trading companies took title, bore risk, held inventory, arranged slitting or delivery, invoiced and collected payment from their own customers, controlled their own resale margins, and protected their own customer information. The Department failed to identify any legal right, contractual authority, or practical ability that allowed NSC to restrain or direct the unaffiliated trading companies' resales, especially with regard to their pricing.

### A.    The Department's Affiliation Theory Required Evidence That NSC Could Control the Unaffiliated Trading Companies

The Department determined that NSC was affiliated with the unaffiliated trading companies under the statute's "control" provision, 19 U.S.C. § 1677(33)(G), based on a principal-agent theory. IDM at Comment 1, P.R. 174. That theory required substantial evidence that NSC was legally or operationally able to restrain or direct the unaffiliated trading companies, particularly in the pricing of their resales to their own customers. 19 U.S.C. §

11

1677(33); 19 C.F.R. § 351.102(b)(3).  The Department's regulation specifically provides that the Department "will not find that control exists … unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."  19 C.F.R. § 351.102(b)(3).  Thus, the relevant question is whether substantial evidence showed that NSC could control the unaffiliated trading companies' downstream resale conduct.  However, the Department did not identify any such evidence.

Under the Department's principal-agent framework, the Department analyzes "whether it is agreed that the agent is to act primarily for the benefit of the principal, not for itself." *Notice of Final Determination of Sales at Less Than Fair Value: Engineered Process Gas Turbo-Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, From Japan*, 62 Fed. Reg. 24394, 24403 (May 5, 1997).  In order to answer that question, the Department considers who took title, bore risk, held inventory, added value, marketed the product, interacted with customers, negotiated price, and issued sales documentation.  *Stainless Steel Sheet and Strip in Coils From Taiwan: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 67 Fed. Reg. 6682 (Feb. 13, 2002), and accompanying Issues and Decision Memorandum at Comment 23.

Capacity to control requires evidence of the ability to restrain or direct.  *China Steel Corp. v. United States*, 264 F. Supp. 2d 1339, 1351 (Ct. Int'l Trade 2003) (the affiliation inquiry turns on the capacity to control rather than the actual exercise of control).  The Department therefore had to measure the whole record against that requirement, including evidence that detracts from its finding.  *Target Corp.*, 609 F.3d at 1358.

The Department's own determinations show the difference between a producer's involvement in customer-specific sales discussions and a producer's control as a principal over a

12

trading company agent. In *DANP from Japan*, the Department found no agency even though the producer negotiated a "general price mechanism" and the end customer was present during price discussions, because the producer had "no knowledge or documentation to identify what mark-up" the reseller charged and did "not know, nor has it ever known, the price charged by the U.S. customer to the end customers." *Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products From Japan; Final Results of Antidumping Duty Administrative Review*; 2015-2016, 82 Fed. Reg. 57715 (Dec. 7, 2017), and accompanying Issues and Decision Memorandum ("*DANP from Japan* IDM") at Comment 1. The Department also found that end-customer awareness of the producer is "common in the production of end customer-specific products" and that those interactions are "inherent in the production of specialized" merchandise. *Id.* In *HRS from Brazil*, the Department found no agency where sales occurred between trading companies and end users, and end users looked to the trading companies for quality, delivery, and price issues. *Certain Hot-Rolled Flat-Rolled Carbon Quality Steel Products From Brazil; Final Results of Antidumping Duty Administrative Review and Termination of the Suspension Agreement*, 67 Fed. Reg. 6226 (Feb. 11, 2002), and accompanying Issues and Decision Memorandum at Comment 1. Those determinations fit the legal distinction the Department ignored here. The Department had to connect NSC's role as a producer to control over the unaffiliated trading companies' own resales. It did not make that connection here.

Additional administrative determinations reinforce this point. In *Refillable Kegs from China*, the Department refused to find agency because, "without an explicit agreement, the evidentiary bar" required affirmative evidence of an implicit agency relationship, and the cited facts were "not sufficient to find a principal-agent relationship." *Refillable Stainless Steel Kegs From the People's Republic of China: Final Results of the Antidumping Duty Administrative*

13

*Review;* 2019-2020, 87 Fed. Reg. 40784 (Jul. 8, 2022), and accompanying Issues and Decision Memorandum at Comment 2 (finding that "a principal-agent relationship does not exist" and that, "without an explicit agreement," the record lacked an "evidentiary basis" to show an implicit agency relationship).  In *Chlorinated Isocyanurates*, the Department rejected a petitioner's agency argument where there was no "agency contract or other explicit evidence demonstrating a principal-agent relationship" and the record showed an "independent, arm's length" relationship, even though the reseller did not maintain inventory or take title. *Chlorinated Isocyanurates From the People's Republic of China*; 2017-2018, 85 Fed. Reg. 10411 (Feb. 24, 2020), and accompanying Issues and Decision Memorandum at Comment 1.

Likewise, in *Stainless Steel Bar from India*, the Department rejected a principal-agent theory where the alleged agent acted as a reseller, the record did not show that the producer participated in the reseller's price negotiations with downstream customers, and the Department found no evidence that the producer directed the reseller's downstream sales of the producer's merchandise.  *Stainless Steel Bar From India: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 47198 (Sept. 15, 2009), and accompanying Issues and Decision Memorandum at Comment 2 (finding that the alleged agent was "a reseller," that the record did not show producer personnel "were in contact with {the reseller's} customers in the price negotiation phase," and that there was no evidence of "any back and forth between {the producer} and {the reseller} as {the reseller} made sales").  These determinations undercut the Department's position in this review.  Producer discussions, technical support, and delivery coordination do not establish NSC's control over the unaffiliated trading companies without evidence that NSC controlled the unaffiliated trading companies' downstream resale prices, invoices, margins or customer terms.

14

The Court has applied the same approach. In *Carpenter*, the reseller took title, bore risk, serviced customers, and acted for its own account; the Court upheld the Department's finding of no agency. *Carpenter Tech. Corp. v. United States*, 34 CIT 1482, 1487-89, 2010 WL 4870570 (2010). *Bio-Lab II* likewise upheld a no-agency determination where the Department considered customer interaction, documentation, merchandise control, and resale facts. *Bio-Lab, Inc. v. United States*, 433 F. Supp. 3d 1287, 1291-97 (Ct. Int'l Trade 2020) ("*Bio-Lab II*"). The agency cases that come out the other way involved facts absent here, such as an agency agreement, a failure to take title, or a lack of meaningful sales responsibilities. *Chia Far Indus. Factory Co. v. United States*, 343 F. Supp. 2d 1344, 1359 (Ct. Int'l Trade 2004) (sustaining affiliation where the Department relied on an "explicit principal/agent agreement" and noted that the "sole agency contract was not controverted"); *Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1269-70 (Ct. Int'l Trade 2006) (sustaining the Department's treatment where the "agent did not take title," the principal "negotiated the price and quantity," and the supposed agents were "agents in name only").

In sum, to establish control by a producer over a trading company under a principal-agent theory, the law requires substantial evidence that the producer could legally or operationally restrain or direct the trading company's resale decisions, particularly with respect to price.

### B. The Department's Theory that NSC Controls the Unaffiliated Trading Companies Based on a Principal-Agent Relationship Fails Because the Factors of the Principal-Agent Test Do Not Evidence NSC's Control

The Department's application of its principal-agent factors to find that NSC controlled the unaffiliated trading companies is flawed under the statute and the Department's regulations. IDM at Comment 1, P.R. 174 (considering "(1) the foreign producer's role in negotiating price and other terms of sale; (2) the extent of the foreign producer's interaction with the customer; (3) whether the agent/reseller maintains inventory; (4) whether the agent/reseller takes title to the

merchandise and bears the risk of loss; (5) whether the agent/reseller further processes or otherwise adds value to the merchandise; (6) the means of marketing a product by the producer to the end customer in the pre-sale period; and (7) whether the identity of the producer on sales documentation inferred such an agency relationship during the sales transactions"). NSC does not dispute that it manufactured NOES to particular end-customer technical requirements, discussed those requirements with end customers, sold NOES to the unaffiliated trading companies, and discussed the FOB price at which it made those sales to the unaffiliated trading companies. Those facts describe NSC's own sale to the unaffiliated trading companies. They do not show that NSC restrained or directed the unaffiliated trading companies when those companies resold NOES to their own customers.

### 1.    Price and Other Terms of Sale Did Not Show that NSC Controlled the Unaffiliated Trading Companies Because NSC Did Not Arrange or Set the Final Invoiced Price or Terms Between the Unaffiliated Trading Companies and End Customers

The Department treated price as the main control factor, consistent with its regulations as discussed above. The IDM stated that NSC had the "right to control the conduct of the trading companies" with respect to "the FOB price of the NOES." IDM at Comment 1, P.R. 174. However, as stated, that statement addressed NSC's *FOB price* for the merchandise it sold to the unaffiliated trading companies. It did not establish that NSC controlled the final prices the unaffiliated trading companies charged their own customers or the margins the unaffiliated trading companies took on those sales. Thus, although the Department recognized price as the main control factor, it examined the wrong price and reached the wrong conclusion under its regulations.

Contrary to the Department's findings, the record showed that the unaffiliated trading companies controlled their downstream sales. The unaffiliated trading companies issued their

16

own resale invoices and collected payment from their own customers.  NSC's AQR at A-23, P.R. 29-38, C.R. 9-23; NSC's SQR at SQR-8 to SQR-9, P.R. 115, C.R. 172-174.  NSC also explained that it did not have access to those invoices and did not require the unaffiliated trading companies to report their invoice terms to NSC.  NSC's BSQR3 at BSQR3-1, P.R. 140, C.R. 187-194.

The resale margin evidence makes the point concrete.  A trading company's margin is the difference between the price it paid NSC and the price it charged its own customer.  The record showed that the unaffiliated trading companies controlled that difference.  NSC's Second Response to Feb. 13 RFI, Exhibit RFI-8, P.R. 138, C.R. 185-186; NSC's Case Brief, Attachment, P.R. 154, C.R. 204-205.  That evidence undercut the Department's finding that NSC controlled the unaffiliated trading companies' resale prices or resale economics.

The Department also relied on NSC's [                                        ].  IDM at Comment 1, P.R. 174.  However, the [          ] evidence did not show that NSC had control over the unaffiliated trading companies' resales.  NSC reported the [          ] separately, NSC [                                        ], and the Department did not identify evidence that the [          ] gave NSC the right to set the unaffiliated trading companies' resale prices, invoices, payment terms, or margins.  NSC's AQR at A-21, P.R. 29-38, C.R. 9-23; NSC's BQR at B-35 and Exhibit B-11, P.R. 49-50, C.R. 25-36.

### 2.    NSC's Negotiations and Interactions With Downstream Customers Were Necessary for the Market and Not Indicative of an Agency Relationship

In addition, the Department relied on NSC's communications with end customers to support its control conclusion.  IDM at Comment 1, P.R. 174.  Those communications evidenced NSC's product support, not control over the unaffiliated trading companies.  Because NOES is made for particular end uses, NSC had commercial and technical reasons to discuss

17

specifications, steel grades, quantities, lead times, logistics, and technical requirements with end customers. NSC's AQR at A-18 to A-19, A-23, A-26, P.R. 29-38, C.R. 9-23; NSC's ASQR at ASQR-12, P.R. 75-78, C.R. 75-87. The Department did not explain how those product discussions gave NSC authority over the unaffiliated trading companies' resale prices, invoices, payment collection, margins, or customer information.

A producer's contact with a trading company's customer does not establish the producer has agency over the trading company when the contact concerns product specifications or technical support and the trading company still makes its own resale. *DANP from Japan* IDM at Comment 1; *Bio-Lab II*, 433 F. Supp. 3d at 1291-97. Here, the unaffiliated trading companies continued to issue invoices, collect payment, manage inventory, protect customer information, and control resale margins. The evidence of NSC's interaction with end customers therefore does not support the Department's control conclusion.

### 3. Sales Documentation and Contract Provisions Did Not Give NSC Control Over Downstream Resales by the Unaffiliated Trading Companies

Moreover, the sales documentation reflected transactions between NSC and the unaffiliated trading companies, not direct sales by NSC to the unaffiliated trading companies' customers. NSC's SQR, Exhibits SQR-2 and SQR-3, P.R. 115, C.R. 172-174. The Department did not identify a resale invoice issued by NSC to a downstream customer, a payment collected by NSC from a downstream customer, or a sales document giving NSC authority over the unaffiliated trading companies' downstream terms.

The Department also relied in part on [                    ] of NSC's basic sales agreements. IDM at Comment 1 n.63, P.R. 174; BPI Memo at 1-2, P.R. 176, C.R. 208. The BPI Memo describes provisions requiring the unaffiliated trading companies to submit [

                                                      ] and to

18

notify NSC of important changes in **[**

**]**.  BPI Memo at 1-2, P.R. 176, C.R. 208.  Those provisions concern

financial reporting and corporate status notice.  They do not give NSC the right to set resale

prices, issue resale invoices, collect payment from downstream customers, control resale

margins, direct customer information, or compel downstream sales data.

### 4. Inventory, Processing, Title, and Risk Showed the Unaffiliated Trading Companies Acted as Purchasers and Resellers

In addition to the foregoing, inventory, processing, title, and risk of loss confirmed that

the unaffiliated trading companies acted as purchasers and resellers.  The unaffiliated trading

companies kept NOES in inventory to handle delivery to end customers and manage their own

inventory after NSC's sale.  NSC's SQR at SQR-6, P.R. 115, C.R. 172-174.  They arranged

slitting or delivery where needed.  *Id*. at SQR-8 to SQR-9.  And they took title when the NOES

was delivered and bore risk of loss after title transferred.  *Id*. at SQR-6 to SQR-8 and Exhibit

SQR-1, Articles 18 and 21.

The Department acknowledged such title and risk, but reasoned that the arrangement was

"orchestrated by NSC and agreed to by the trading companies for NSC's benefit."  IDM at

Comment 1, P.R. 174.  That reasoning did not identify control over the unaffiliated trading

companies' resales.  A producer may arrange production and delivery in ways that support its

own sale.  However, that arrangement does not give the producer authority over the reseller's

later sale to its own customer.

The Department cited *Steel Threaded Rod from India* for the proposition that title and

risk are not dispositive.  IDM at Comment 1, P.R. 174.  That determination supports agency only

where the rest of the record shows control by a principal.  *Steel Threaded Rod from India:*

*Preliminary Determination of Sales at Less Than Fair Value, Affirmative Preliminary*

19

*Determination of Critical Circumstances, in Part, and Postponement of Final Determination*, 79 Fed. Reg. 9164 (Feb. 18, 2014), unchanged in *Steel Threaded Rod from India: Final Determination of Sales at Less Than Fair Value and Final Determination of Critical Circumstances, in Part; 2012-2013*, 79 Fed. Reg. 40714 (July 14, 2014) (explaining that the Department considers the factors "together" to capture the "totality of the circumstances" and treats the principal-agent inquiry as "case-specific"). Here, the totality of the circumstances points the other way. The unaffiliated trading companies bought and owned the NOES, bore risk, maintained inventory, arranged resale logistics, invoiced and collected payment from their own customers, protected their own customer information, and refused to provide their own downstream sales data. NSC's AQR at A-23 to A-26, P.R. 29-38, C.R. 9-23; NSC's SQR at SQR-6 to SQR-9 and Exhibit SQR-1, Articles 18 and 21, P.R. 115, C.R. 172-174; NSC's SQR2, Exhibit SQR2-2, P.R. 119-120, C.R. 176-178. Those facts show the unaffiliated trading companies acted as purchasers and resellers, not as NSC's agents.

### 5. The Remaining Record Evidence Does Not Show Any Other Mechanism Through Which NSC Controlled the Unaffiliated Trading Companies

Finally, the Department did not find common ownership, shared management, debt financing, franchise agreements, joint venture agreements, or reliance showing that NSC could restrain or direct the unaffiliated trading companies, especially as to the pricing of their downstream resales. Instead, the Department relied on ordinary features of a producer-reseller relationship, including technical support, FOB price discussions, sales documentation, delivery coordination, and contractual reporting provisions. Those features did not give NSC control over the unaffiliated trading companies' downstream resales.

The unaffiliated trading companies' refusal to provide downstream sales data confirmed that those records belonged to the unaffiliated trading companies and their own customers. For

home market sales, NSC asked the unaffiliated trading companies to provide data on their resales; the unaffiliated trading companies refused. NSC's SQR2 at SQR2-3 to SQR2-6 and Exhibit SQR2-2, P.R. 119-120, C.R. 176-178. A company that controls an agent does not ask for records of the agent's sale and then accept refusal. The refusal showed control by the unaffiliated trading companies, not NSC.

In sum, the Department proved only NSC's involvement in sales discussion as a producer of NOES. NSC produced and sold NOES that had to meet particular technical requirements, and NSC communicated with end customers about that product. However, the unaffiliated trading companies bought the NOES, owned it, bore the risk of loss, resold it to their own customers, controlled the resale economics, and kept the resale records as their own. The Department's finding that NSC was affiliated with the unaffiliated trading companies therefore lacks support in substantial record evidence, and should be remanded for reconsideration.

## II. The Department's Use of FA and AFA With Respect to Downstream Sales Information from the Unaffiliated Trading Companies Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

Even if the Court sustains the Department's affiliation finding, the Department still had to follow 19 U.S.C. § 1677e in sequence before it could apply FA and AFA. The Department's determination to apply FA and AFA to missing downstream resale information raises two distinct issues. First, for requested downstream resale information, while 19 U.S.C. § 1677e(a) allows neutral FA if necessary information remains missing, 19 U.S.C. § 1677e(b) does not allow AFA unless the Department separately finds, based on substantial evidence, that NSC failed to act to the best of its ability to obtain the requested downstream resale records. Second, for information the Department never requested from certain of the unaffiliated trading companies, the Department had no justification at all to apply either FA or AFA.

21

**A.     The Statute Requires the Department To Make Separate Findings Before Using FA and AFA**

For applying FA and AFA, the statute imposes separate requirements under 19 U.S.C. § 1677e(a) and 1677e(b).  Section 1677e(a) addresses whether the Department may use facts otherwise available (i.e., use FA) when necessary information is missing or when requested information has not been provided.  Section 1677e(b) separately addresses a different question: whether the Department may select facts using an adverse inference (i.e., use AFA) because the respondent failed to cooperate by not acting to the best of its ability.

The Federal Circuit treats those two statutory steps as distinct.  *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1346-48 (Fed. Cir. 2011) (FA may be used where "the mere failure of a respondent to furnish requested information" leaves a gap, but AFA requires the separate determination that the respondent failed to act to the best of its ability).  That distinction becomes critical when the missing information belongs to a third party.  *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1232-36 (Fed. Cir. 2014) ("*Mueller*") (vacating and remanding where an adverse inference against a non-cooperating supplier carried collateral consequences for a cooperating respondent, and requiring Commerce to "carry out a case-specific analysis of the applicability of deterrence" and to consider whether the respondent could have induced the supplier's cooperation, with accuracy as the predominant interest).

The best of its ability standard required the Department to identify what NSC objectively could do and then show that NSC subjectively failed to do it.  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (notably: "best" means "one's maximum effort"; "ability" means "the quality or state of being able"; and the inquiry asks whether the respondent "put forth its maximum effort to provide Commerce with full and complete answers to all

22

inquiries"). The Department therefore could not infer noncooperation from the mere fact that third party records were missing.

### B.  For Requested Downstream Resale Information, the Department Could at Most Use FA, Not AFA

The Department requested downstream sales information from certain unaffiliated trading companies, and NSC transmitted those requests to those companies. NSC's Response to Feb. 13 RFI, Exhibits RFI-1 to RFI-4, P.R. 135, C.R. 183; NSC's Second Response to Feb. 13 RFI, Exhibits RFI-5 to RFI-8, P.R. 138, C.R. 185-186. NSC informed the Department that it had "complied with all of Commerce's requests by sending sections B and C of the AD questionnaire to the unaffiliated trading companies and providing the unaffiliated trading companies with instructions and guidance on how to respond to the questionnaire and prepare their sales data." IDM at Comment 2, P.R. 174.

The Department then adopted the leverage theory pressed by the domestic interested parties. Cleveland-Cliffs argued that NSC should have used "maximum leverage," including threats to discontinue business. Cleveland-Cliffs Rebuttal Brief at 8, P.R. 160, C.R. 206. U. S. Steel argued that NSC had influence over the unaffiliated trading companies and could use future business as an incentive. U. S. Steel Rebuttal Brief at 31-33, P.R. 161, C.R. 207. The Department found that NSC "did not exert its maximum effort" and faulted NSC for not using "mechanisms," "leverage," or "financial incentives" to compel the unaffiliated trading companies to produce the requested downstream resale information. IDM at Comment 2, P.R. 174. However, the Department did not identify substantial evidence that any lawful incentive available to NSC would have overcome the unaffiliated trading companies' refusals and produced their downstream resale records.

The cases cited by the Department and domestic interested parties do not fill that

23

evidentiary gap. *Jinko Solar* involved an ongoing supplier relationship in which the respondent continued buying from suppliers that had previously refused to cooperate, and the court noted that the plaintiff could have attempted to offer to pay more or establish a confidentiality agreement before continuing that relationship. *Jinko Solar Import & Export Co. v. United States*, 701 F. Supp. 3d 1367, 1394 (Ct. Int'l Trade 2024). That is not this record. The unaffiliated trading companies refused because of confidentiality, customer, reputational, resource, and legal concerns. NSC's SQR2 at SQR2-3 to SQR2-6 and Exhibit SQR2-2, P.R. 119-120, C.R. 176-178. Unlike in *Jinko Solar*, NSC did not simply continue dealing with previously noncooperative suppliers without attempting to reduce barriers to cooperation. NSC repeatedly requested the data and offered support in translating, compiling, and submitting the data, including legal services to secure additional time to prepare submissions. *Id*.; NSC's Case Brief at 43-44 & n.154, P.R. 154, C.R. 204-205. The Department did not identify any additional offer, incentive, confidentiality arrangement, or contractual provision that NSC could have used to overcome the trading companies' refusals.

*Mukand* likewise involved a respondent's own product-specific cost records and repeated failures to provide cost data or a meaningful explanation. *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1303-04 (Fed. Cir. 2014) ("repeatedly failed to provide product-specific cost data by size"). It does not support AFA where NSC forwarded the Department's requests for third-party information, offered support, and the third party unaffiliated trading companies refused to produce their own (as opposed to NSC's own) downstream resale records.

The Department also stated that "Commerce lacks subpoena power" and that AFA provides "an incentive to cooperate." IDM at Comment 2, P.R. 174. The Department's lack of subpoena power does not change 19 U.S.C. § 1677e(b). That statute requires a finding that NSC

24

failed to cooperate by not acting to the best of its ability, and that finding requires evidence of what NSC could do to compel third party cooperation. The Department could not shift responsibility for third party refusal to cooperate to NSC without identifying a mechanism available to NSC to overcome that refusal.

Nor could the Department's finding that the unaffiliated trading companies are NSC's agents substitute for the required finding that NSC did not act to the best of its ability for applying AFA. If the Court sustains the Department's principal-agent finding, that finding may explain why the Department requested downstream data from the unaffiliated trading companies. But it does not prove that NSC could force the unaffiliated trading companies to provide data after they refused production. The Department still had to identify what additional effort NSC failed to undertake to obtain the downstream resale records from the unaffiliated trading companies.

For these reasons, the Department had no basis in substantial evidence to apply AFA to missing downstream resale information from the unaffiliated trading companies from which the Department requested such information. The Court should therefore remand with instructions that the Department apply, at most, neutral FA to such information.

### C. For Downstream Resale Information the Department Never Requested, the Department Could Use Neither FA Nor AFA

The Department also improperly applied FA and AFA to sales involving unaffiliated trading companies from which it never requested home market downstream resale information. Under 19 U.S.C. § 1677e(a), the Department had to identify a gap in required information for those sales before using FA, and 19 U.S.C. § 1677e(b) permits AFA only when a party fails to cooperate with a request for information. Information never requested from an unaffiliated trading company therefore could not support either the Department's asserted bases for FA or

25

AFA.

NSC identified [      ] home market unaffiliated trading companies: [

                                    ].  NSC's SQR2 at SQR2-3, P.R. 119-120, C.R. 176-

178.  The Department did not request downstream resale information from all of these

unaffiliated trading companies.  The Feb. 13 RFI identified only [

      ] for home market sales information; and [          ] for U.S. sales information.  Feb. 13

RFI at 1, P.R. 127, C.R. 180; NSC's Response to Feb. 13 RFI, Exhibit List, P.R. 135, C.R. 183;

NSC's Second Response to Feb. 13 RFI, Exhibit List, P.R. 138, C.R. 185-186.  Thus, the

Department did not request home market resale data from [                              ].

Nevertheless, in its home market analysis, the Department applied the adverse [          ]

yen gross unit price to "all sales through trading companies which NSC reported as unaffiliated."

Final Analysis Memo at 2, P.R. 177, C.R. 209.  The programming instruction was: [

                              ] *Id*.  The Department therefore applied the

same adverse value to sales involving unaffiliated trading companies that received a request for

home market sales information and those that did not.

That adverse substitution was unreasonable on the particular facts.  The Department itself

acknowledged that under *Mueller*, "the purpose of the Act is fairness and accuracy, and the

purpose of applying AFA, in whole or in part, is to induce cooperation without being punitive."

IDM at Comment 3, P.R. 174.  *Mueller* likewise does not permit an adverse substitution that

ignores the predominant interest in calculating an accurate rate or that is not reasonable on the

particular facts.  *Mueller*, 753 F.3d at 1236-39.  The adverse [          ] yen substitution did not

fit any company-specific gap for companies from which the Department never requested home

market downstream resale information.

26

The Court should therefore remand with instructions that the Department apply neither FA nor AFA to downstream resale information it never requested from the unaffiliated trading companies.

## III.    The Department's Use of AFA With Respect to NSC's U.S. Sales Is Not Supported by Substantial Evidence and Not Otherwise in Accordance with Law

Finally, the Department had no basis to apply AFA to NSC's U.S. sales because [         ] provided the U.S. sales database the Department requested.  The Department waited until February 13, 2025, to request information directly from [         ].  That request asked for the information sought in the Dec. 13 Supplemental Questionnaire, and [         ] responded with a database reporting its U.S. sales to its U.S. end customer, just as requested. The Department then rejected that database in the *Final Results* because [         ] had not provided a narrative Section C response.  IDM at Comment 2, P.R. 174.  The statute – 19 U.S.C. §§ 1677e(a), 1677m(d), and 1677m(e) – does not permit that outcome.

### A.    The Statute Requires the Department To Identify Any Deficiency Before Using FA or AFA, and Otherwise Use Submitted Information That Meets the Statutory Criteria

Under 19 U.S.C. § 1677e(a), the application of FA (and consequently also AFA) is tethered to 19 U.S.C. § 1677m(d), which requires the Department to identify the "nature of the deficiency" if a response does not comply with a request from the Department and provide an opportunity to remedy or explain the deficiency.  The Department may not wait until the final results of a review to reveal the deficiency that causes it to reject record information.  *Hyundai Steel Co. v. United States*, 518 F. Supp. 3d 1309, 1322, 1326-28 (Ct. Int'l Trade 2021) (The Department must "notify" the respondent of "the nature of the alleged deficiency(ies)" and provide an opportunity to remedy); *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1369 (Ct. Int'l Trade 2021).  Broad or repeated requests do not satisfy § 19 U.S.C. § 1677m(d)

PUBLIC VERSION

when the Department later relies on a specific deficiency that it never identified. *Baroque Timber Indus. (Zhongshan) Co. v. United States*, 766 F. Supp. 3d 1296, 1311-13 (Ct. Int'l Trade 2025) (The Department must "specifically point{} out and request{} clarification" of the deficiency); *Saha Thai Steel Pipe Public Co. v. United States*, 605 F. Supp. 3d 1348 (Ct. Int'l Trade 2022) (The Department must "promptly inform" the respondent of "the nature of the deficiency" and provide an "opportunity to remedy or explain"); *Shelter Forest International Acquisition, Inc. v. United States*, Slip Op. 26-5, 2026 WL 413045 (Ct. Int'l Trade Jan. 28, 2026) (generic questionnaires did not provide "required notice" of "particular deficiencies").

Separately, 19 U.S.C. § 1677m(e) provides that the Department "shall not decline to consider" submitted information if the information is timely, can be verified, is not so incomplete that it cannot serve as a reliable basis, was submitted by a party acting to the best of its ability, and can be used without undue difficulty. The Department therefore had to apply those criteria to **[         ]** submitted U.S. sales database before rejecting it.

**B.    The Department Could Not Reject [              ] U.S. Sales Database Without First Identifying a Deficiency and Providing an Opportunity To Remedy or Explain**

**[          ]** complied with the Department's request for information with respect to NSC's U.S. sales and the Department did not identify any deficiency in **[          ]** response, so the Department had no basis to reject **[          ]** U.S. sales database and instead apply FA and AFA to NSC's U.S. sales. On December 13, 2024, the Department requested "a separate U.S. sales database" reporting sales of NSC's NOES from the unaffiliated trading company handling NSC's NOES exports to the United States to the first unaffiliated U.S. customer. Dec. 13 Supplemental Questionnaire, P.R. 116, C.R. 175. On February 13, 2025, the Department directly requested from **[          ]** the information sought in the Dec. 13 Supplemental Questionnaire. Feb. 13 RFI at 1, P.R. 127, C.R. 180 ("Commerce is directly requesting that the

'unaffiliated' trading companies provide the information that Commerce sought from NSC in Commerce's December 13, 2024, supplemental questionnaire"). [          ] then provided the requested U.S. sales database. NSC's Second Response to Feb. 13 RFI, Exhibit RFI-8, P.R. 138, C.R. 185-186. [          ] therefore fully complied with the Department's request for information.

The Department did not reject [          ] U.S. sales data because of any substantive issue, such as a price field was missing, a transaction could not be identified, or the database could not be processed; rather, it relied on the notion that [          ] failed to submit a Section C narrative. The IDM states that "the Japanese trading company through which NSC sold subject merchandise to end customers in the United States during the POR provided sales data for its sales of NSC's NOES," IDM at Comment 2, P.R. 174, but the Department rejected the information because the trading company "provided no narrative response to section C." *Id*. at Comment 3, P.R. 174. However, 19 U.S.C. § 1677m(d) required the Department to identify that deficiency and provide an opportunity to remedy or explain it before rejecting [          ] U.S. sales data and applying FA and AFA. The Department did not do so, so it erred in rejecting [          ] U.S. sales data.

**C.    The Department Had To Use [          ] U.S. Sales Database Because the Statutory Criteria for Using Submitted Information Were Met**

Meanwhile, [          ] submitted U.S. sales database satisfied § 1677m(e). It was timely submitted in response to the Department's Feb. 13 RFI. It reported transaction-specific U.S. sales from [          ] to its end customer, gross unit price, NSC's sales price to [          ], and the difference between [          ] net price to its end customer and the price NSC charged [          ]. NSC's Second Response to Feb. 13 RFI, Exhibit RFI-8, P.R. 138, C.R. 185-186. That information directly answered the Department's requests with respect

29

to NSC's U.S. sales.

The Department made no finding that the database was untimely, unverifiable, internally inconsistent, too incomplete to serve as a reliable basis, submitted by a party failing to act to the best of its ability, or unusable without undue difficulty.  Instead, the Department used the database to identify the U.S. sales universe and then replaced the reported prices with the lowest U.S. gross unit price on record.  Final Analysis Memo at 3, P.R. 177, C.R. 209.  However, the Department had to explain why § 1677m(e) allowed it to discard the reported U.S. transaction prices.  *Risen Energy Co., Ltd. v. United States*, 724 F. Supp. 3d 1356, 1364-65 (Ct. Int'l Trade 2024) (The Department must show submitted information "is not reasonably verifiable" before applying AFA, and must at least attempt verification to make that showing).  The Department did not provide that explanation; nor could it under the existing record.

The Court should therefore remand with instructions for the Department to calculate NSC's U.S. price using **[                    ]** submitted U.S. sales database.  In the alternative, if the Court concludes that the Department may treat the missing narrative Section C response as a deficiency, the Court should instruct the Department to reopen the record, identify the specific deficiency, provide the opportunity to remedy or explain required by § 19 U.S.C. § 1677m(d), and then use the submitted information to the extent required by § 1677m(e).

PUBLIC VERSION

## IV.    CONCLUSION

For the foregoing reasons, NSC respectfully requests that the Court grant its Motion for Judgment on the Agency Record and remand this case with instructions to recalculate NSC's dumping margin.

A proposed order is attached.

Respectfully submitted,

Shawn M. Higgins
Rajib Pal
Ashlande Gelin
Lloyd Lyall
Danielle V. Cossey


Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8329
shawn.higgins@sidley.com

*Counsel to Plaintiff,*
*Nippon Steel Corporation*

June 30, 2026

31

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE LISA W. WANG, JUDGE**

NIPPON STEEL CORPORATION,

                                        Plaintiff,

            v.

UNITED STATES,                                                    Court No. 26-00747

                                        Defendant,

CLEVELAND-CLIFFS INC.,

UNITED STATES STEEL CORPORATION,

                                        Defendant-Intervenors.

**ORDER**

Upon consideration of the Motion for Judgment on the Agency Record filed by plaintiff, Nippon Steel Corporation ("NSC"), and upon all other papers and proceedings herein, it is hereby

**ORDERED** that NSC's Motion for Judgment on the Agency Record is granted; and it is further

**ORDERED** that the determination by the U.S. Department of Commerce ("Department") in *Non-Oriented Electrical Steel From Japan: Final Results of Antidumping Duty Administrative Review: 2022-2023*, 90 Fed. Reg. 59501 (Dec. 19, 2025) is unsupported by substantial evidence and otherwise contrary to law in the following respects: (i) the Department's finding under 19 U.S.C. § 1677(33) and 19 C.F.R. § 351.102(b)(3) that NSC was affiliated with trading companies that NSC reported as unaffiliated; (ii) the Department's application of facts otherwise available with adverse inferences under 19 U.S.C. §§ 1677e(a) and (b) to downstream resale information from trading companies that NSC reported as unaffiliated and from which the Department did and did not request information; and (iii) the Department's application of facts otherwise available with adverse inferences under 19 U.S.C. § 1677e to NSC's U.S. sales without regard to 19 U.S.C. §§ 19 U.S.C. § 1677m(d) and (e) despite U.S. sales information submitted by NSC's U.S. trading company; and it is further

**ORDERED** that this action is remanded to the Department for the purpose of recalculating NSC's dumping margin after reconsideration of each of the foregoing findings by the Department that are unsupported by substantial evidence and otherwise contrary to

law; and it is further

**ORDERED** that the Department shall file its remand determination with the Court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.

**SO ORDERED.**


_____
Lisa W. Wang, Judge



Dated: _____, 2026
        New York, New York

**CERTIFICATE OF COMPLIANCE**

In accordance with the Chambers Procedures of the United States Court of International Trade, the undersigned certifies that this brief complies with the word limitations set forth in the Chambers Procedures. Specifically, excluding those exempted portions of the brief, as set forth in Chambers Procedure 2(B), I hereby certify that this brief contains 9007 words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

_____
Shawn M. Higgins

## CERTIFICATE OF SERVICE

I hereby certify that copies of the attached documents are being served by CM/ECF, on June 30, 2026, addressed to the following parties:

**On behalf of the United States:**
Attorney-in-Charge
U.S. Department of Justice
International Trade Field Office
26 Federal Plaza – Room 346
Civil Division
New York, NY 10278

General Counsel
Department of Commerce
14th & Constitution Avenue, N.W.
Washington, DC 20230

Director, Civil Division
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street NW, Room 12124
Washington, DC 20530

**On behalf of Cleveland-Cliffs Inc.:**
Stephen P. Vaughn
King & Spalding LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006

**On behalf of United States Steel Corporation:**
James Edward Ransdell, IV
Cassidy Levy Kent (USA) LLP
2112 Pennsylvania Avenue, NW.
Suite 300
Washington, DC 20037

Shawn M. Higgins