**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

NIPPON STEEL CORPORATION,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

CLEVELAND-CLIFFS INC. and UNITED STATES STEEL CORPORATION,

Defendant-Intervenors.

Court No. 26-00747

**PUBLIC DOCUMENT**

# RESPONSE BRIEF OF DEFENDANT-INTERVENOR CLEVELAND-CLIFFS INC. IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Stephen P. Vaughn
Daniel L. Schneiderman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

Counsel for Defendant-Intervenor
Cleveland-Cliffs Inc.

November 24, 2026

# TABLE OF CONTENTS


STATEMENT PURSUANT TO RULE 56.2 ..... 1

I. ADMINISTRATIVE DETERMINATION UNDER REVIEW ..... 1

II. ISSUES PRESENTED ..... 1

ARGUMENT ..... 3

I. SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S FINDING THAT NSC CONTROLLED THE TRADING COMPANIES THROUGH A PRINCIPAL-AGENT RELATIONSHIP ..... 3

II. COMMERCE LAWFULLY RELIED ON ADVERSE FACTS AVAILABLE ..... 4


# TABLE OF AUTHORITIES

**Page(s)**

**Cases**


*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ..... 5

*Nippon Steel Corp. v. United States*, 829 F. Supp. 3d 1274 (Ct. Int'l Trade 2026) ..... 2, 4, 5


**Statutes**


19 U.S.C. § 1677e(b) ..... 2, 5, 6

Japanese Antimonopoly Act ..... 2, 4, 5


**Other Authorities**


*Non-Oriented Electrical Steel From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 59,501 (Dep't of Commerce Dec. 19, 2025) ..... 1

*Non-Oriented Electrical Steel From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 35,659 (Dep't of Commerce June 12, 2026) ..... 6

**RESPONSE BRIEF OF DEFENDANT-INTERVENOR CLEVELAND-CLIFFS INC. IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant-Intervenor Cleveland-Cliffs Inc. ("Cliffs"), a domestic producer of non-oriented electrical steel ("NOES"), submits this brief in opposition to the Rule 56.2 motion of Plaintiff Nippon Steel Corporation ("NSC"). NSC challenges *Non-Oriented Electrical Steel From Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 59,501 (Dep't of Commerce Dec. 19, 2025) ("Final Results") (P.R. 175), and the accompanying Issues and Decision Memorandum (Dec. 15, 2025) ("IDM") (P.R. 174). That challenge should be rejected. Cliffs agrees with Defendant's Response Brief, filed October 20, 2026 (ECF Nos. 39, 40) ("Def. Br."). To minimize repetition, Cliffs incorporates by reference the statement of facts and argument sections of Defendant's brief, as well as its proposed order. For the reasons set forth in Defendant's brief, and as further demonstrated below, NSC's arguments lack merit, and the Final Results should be sustained.

**STATEMENT PURSUANT TO RULE 56.2**

**I. ADMINISTRATIVE DETERMINATION UNDER REVIEW**

The determination under review is the Final Results and accompanying IDM in the administrative review of the antidumping duty order on NOES from Japan (A-588-872) covering December 1, 2022, through November 30, 2023.

**II. ISSUES PRESENTED**

1. Whether Commerce's determination that NSC was affiliated with certain trading companies is based on substantial evidence and otherwise in accordance with law.

2. Whether Commerce's application of facts otherwise available with an adverse inference ("AFA") due to NSC's failure to act to the best of its ability to provide requested

information about its home-market and U.S. sales through affiliated trading companies is supported by substantial evidence and otherwise in accordance with law.

## SUMMARY OF ARGUMENT

Commerce's affiliation finding is supported by substantial evidence. Applying its well-established seven-factor test, Commerce reasonably found that NSC controlled the trading companies through a principal-agent relationship, most importantly by negotiating and setting the prices charged to end customers. NSC's points that the trading companies issued invoices and controlled their own profit margins do not detract from that finding; if anything, they confirm that the trading companies functioned as NSC's agents earning the equivalent of a commission on prices set by NSC.

Commerce also lawfully applied AFA. NSC did not provide the requested downstream sales data and did not act to the best of its ability to obtain it. This Court sustained AFA against NSC on closely similar facts in *Nippon Steel Corp. v. United States*, 829 F. Supp. 3d 1274 (Ct. Int'l Trade 2026) ("*Nippon Steel 2026*"), rejecting the same Japanese Antimonopoly Act justification that NSC raised before Commerce here and has now abandoned. By its own account, NSC could have exerted greater leverage over the trading companies but chose not to, and it offered no incentives to secure their cooperation. Moreover, NSC obtained the same type of data from its trading companies in the next review, which shows it could have done so here. Overturning AFA would reward NSC's non-cooperation, contrary to the purpose of 19 U.S.C. § 1677e(b).

# ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S FINDING THAT NSC CONTROLLED THE TRADING COMPANIES THROUGH A PRINCIPAL-AGENT RELATIONSHIP

As Defendant explains, the record supports a finding of affiliation between NSC and certain trading companies based on a principal-agent relationship, applying the traditional seven-factor test for such relationships. Def. Br. at 11-31. In particular, the record shows that (1) NSC controlled the trading companies' prices and terms of sale to end customers, (2) NSC interacted directly with end customers, with trading companies playing a support role, (3) to the extent that the trading companies maintained inventories, they did so to facilitate NSC's sales to end customers, (4) to the extent that the trading companies took title to the merchandise and bore risk of loss, they did so for NSC's benefit, (5) the trading companies did not independently add value to the merchandise, and to the extent that the trading companies paid third parties to slit certain coils, all such activities were arranged and approved by NSC, (6) NSC marketed directly to end customers, and (7) sales documents to end customers identified NSC as the manufacturer. *Id.*

With respect to the first and most important factor, *i.e.*, the setting of prices to end customers, NSC states that the trading companies issued their own invoices and collected payment from those customers. Pl. Br. at 16-17. But which entity issues the invoice says nothing about which entity negotiated the price. NSC does not dispute Commerce's extensive and well-supported findings that prices to end customers were negotiated and set by NSC itself rather than by the trading companies. *See* IDM at 7-9. NSC instead contends that even if the trading companies do not control prices to their own customers, they do control the spread between the purchase price paid to NSC and the resale price collected from end customers (*i.e.*, their profit margins). Pl. Br. at 17. This argument, however, does not advance NSC's position. If anything, it shows that the trading companies behave like agents collecting the equivalent of a

commission on downstream prices set by NSC. None of Plaintiff's arguments with respect to the other factors undermines Commerce's finding, based on the totality of the evidence, of a principal-agent relationship between NSC and the trading companies. *See* Def. Br. at 25-31. Commerce's findings are supported by substantial evidence and should be sustained.

## II. COMMERCE LAWFULLY RELIED ON ADVERSE FACTS AVAILABLE

Defendant shows that (1) Commerce requested data regarding downstream sales made by NSC's affiliated trading companies that are missing from the record, (2) the limited data provided by one trading company were so incomplete that they could not serve as a reliable basis for determining constructed export price, (3) NSC failed to act to the best of its ability to provide the requested data, and (4) Commerce complied with all requirements for notifying NSC of deficiencies in its responses and providing opportunities to remedy such deficiencies. Def. Br. at 31-44.

Cliffs would add that this Court recently sustained Commerce's application of AFA against NSC on very similar facts in the 2018-2019 administrative review of hot-rolled steel from Japan. *See Nippon Steel 2026*, 829 F. Supp. 3d 1274. In that case, as here, Commerce applied an adverse inference when NSC failed to obtain downstream sales data from its home-market affiliates. NSC claimed that the Japanese Antimonopoly Act precluded it from using its leverage as a supplier to require its affiliated resellers to provide the requested data. *Id.* at 1284-85. Commerce rejected that claim, and the Court sustained Commerce's determinations that (1) it "would not be an unjust activity barred by Japanese antitrust law for Nippon Steel to use its economic strength to obtain necessary data in the normal business practice of responding to antidumping allegations" and (2) NSC's "Japanese antitrust law arguments raised cannot shield Nippon Steel and do not show that Nippon Steel acted to the best of its ability to obtain the

requested information from its affiliate." *Id.* at 1287. In this case, NSC invoked the same Japanese Antimonopoly Act as the reason it could not exert greater efforts to obtain the requested information from the trading companies. *See* NSC's Response to the December 13 Supplemental Questionnaire (Jan. 10, 2025) (P.R. 119-120) at SQR2-3; NSC's Case Brief (May 9, 2025) (P.R. 154) at 44-46 (stating that "under the Japanese Antimonopoly Act, NSC is precluded from engaging more forcefully with its trading companies to procure this data"). Commerce rejected that argument for the same reasons it did in the hot-rolled steel case. IDM at 20-21. NSC has now abandoned that argument and does not cite the Antimonopoly Act in its brief to this Court. But abandoning the argument does not erase its implication: by NSC's own account, *it could have exerted greater leverage over the trading companies, but elected not to do so for a legally invalid reason*. NSC therefore failed to "put forth its maximum effort" and did not act to the best of its ability to obtain the requested information. *See* 19 U.S.C. § 1677e(b); *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).

*Nippon Steel 2026* also found it reasonable for Commerce to expect more of NSC because NSC had been on notice of the downstream sales requirement since the 2016 investigation. *Nippon Steel 2026,* 829 F. Supp. 3d at 1286-88. As the Court explained, "maximum effort requires that Nippon Steel should have tried to take action beyond what had failed to induce compliance in the past," and "simply requesting the data several times was not the only action that Nippon Steel could have taken to induce compliance." *Id.* at 1289. Here, NSC has not shown that it did more, either with carrots or sticks. As Commerce explained, no evidence was presented that NSC offered "financial incentives that could be used to motivate and encourage cooperation." IDM at 21. And NSC declined to take any "coercive actions (e.g., threats to discontinue business)" based on antitrust concerns that Commerce found invalid. IDM

at 20-21. Commerce's finding that NSC failed to cooperate by not acting to the best of its ability to provide the requested information is well-grounded.

Had NSC put forth its maximum effort to obtain the requested data, it clearly *could have* obtained such data, as evidenced by the fact that it *did* obtain such data in the subsequent administrative review. In the 2023-2024 NOES review, Commerce again found that NSC is affiliated with certain trading company customers through principal-agent relationships. *Non-Oriented Electrical Steel From Japan: Preliminary Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 35659 (June 12, 2026), Preliminary Decision Memorandum at 4 (ACCESS Barcode 4927212-02). Commerce again requested that NSC obtain downstream sales information in that review, and this time the "trading companies used by NSC provided their sales information." *Id*. at 2. NSC has offered no reason why it could not have done the same in the 2022-2023 review. The obvious inference is that NSC believed it could withhold the requested information without consequence, and that it became cooperative in the subsequent review only after Commerce applied AFA in this review. Rejecting Commerce's use of AFA here would remove the incentive for NSC to act to the best of its ability to obtain information from its affiliates in future proceedings, contrary to the purpose of 19 U.S.C. § 1677e(b).

## CONCLUSION

For these reasons, Cliffs respectfully requests that the Court deny NSC's Rule 56.2 motion, sustain the Final Results, and enter judgment for the United States.

Respectfully submitted,

*/s/ Daniel Schneiderman*
Stephen P. Vaughn
Daniel L. Schneiderman
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

Counsel for Defendant-Intervenor
Cleveland-Cliffs Inc.

November 24, 2026

**CERTIFICATE OF COMPLIANCE**
**WITH WORD COUNT LIMITATIONS**

Pursuant to paragraph 2(B)(2) of the U.S. Court of International Trade's *Standard Chambers Procedures*, the undersigned certifies that this brief complies with applicable word count limitations. Exclusive of the exempted portions, as provided in paragraph 2(B)(1), this brief includes 1,741 words. In preparing this certificate, the undersigned has relied upon the word count feature of the word-processing system used to prepare the submission.

*/s/ Daniel Schneiderman*
Daniel L. Schneiderman

KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 737-0500

*Counsel for Cleveland-Cliffs Inc.*

November 24, 2026