**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

| | | |
|---|---|---|
| NIPPON STEEL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>CLEVELAND-CLIFFS INC., and UNITED STATES STEEL CORPORATION,<br><br>Defendant-Intervenors. | ) | Court No. 26-00747 |

**ORDER**

Upon consideration of the Rule 56.2 motion of Plaintiff Nippon Steel Corporation's ("NSC" or "Plaintiff") supporting memorandum of law, all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

**ORDERED**, that Plaintiff's motion is denied; and it is further

**ORDERED**, that the challenged decision of the U.S. Department of Commerce is sustained in all respects challenged by Plaintiff.

Date: ________________________
New York, New York

Signed:____________________________
Lisa W. Wang, Judge

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE LISA W. WANG, JUDGE**

| | |
|---|---|
| NIPPON STEEL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>CLEVELAND-CLIFFS INC., and UNITED STATES STEEL CORPORATION,<br><br>Defendant-Intervenors. | Court No. 26-00747<br><br>**NONCONFIDENTIAL VERSION**<br><br>Business Confidential Information Removed from Square Brackets on Pages 2, 10-13. |

**UNITED STATES STEEL CORPORATION'S RESPONSE IN OPPOSITION TO PLAINTIFF'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

James E. Ransdell
Thomas M. Beline
Shanni Alon
Margaret E. Monday
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20037
Tel: (202) 567-2300
*jransdell@cassidylevy.com*

*Counsel to United States Steel Corporation*

Dated: November 24, 2026

# Table of Contents

Page

STATEMENT PURSUANT TO RULE 56.2 ..... 1

I. Administrative Determination Under Review ..... 1

II. Issues Presented ..... 1

III. Request for Relief ..... 2

STATEMENT OF FACTS ..... 2

STANDARD OF REVIEW ..... 6

ARGUMENT ..... 6

I. Commerce's Finding That a Principal-Agent Relationship Existed Between Plaintiff and Its Home Market Trading Companies Is Supported by Substantial Evidence ..... 7

A. Commerce Identified Ample Record Evidence of a *De Facto* Agency Relationship ..... 9

1. Plaintiff plays a key role in negotiating price and other terms of sale, which binds the trading companies to such terms ..... 10

2. Plaintiff has extensive interactions with the end customer ..... 10

3. Plaintiff is involved in marketing NOES to end customers in the pre-sale period ..... 11

4. Sales documentation makes clear Plaintiff's chief role in the sales transaction and that the trading companies played a supporting role ..... 12

5. Home market trading companies do not process or otherwise add value to the merchandise beyond what Plaintiff pre-arranged ..... 13

6. Trading companies maintained inventory for Plaintiff's benefit ..... 14

7. Trading companies took title and bore risk of loss for Plaintiff's benefit ..... 14

B. Plaintiff Identifies No Record Evidence to Compel a Contrary Conclusion, and the Court Should Reject Plaintiff's Invitation to Re-Weigh the Evidence as Contrary to the Substantial Evidence Standard of Review ..... 15

II. Commerce's Application of Partial Adverse Facts Available Is Supported by Substantial Evidence And Is Otherwise in Accordance with Law ..... 16

A. Commerce Reasonably Found a Gap in the Administrative Record When Plaintiff Failed to Answer Commerce's Requests for Information .............................. 16

1. Plaintiff Failed to Report Sales Through Trading Companies.............................. 17

2. Sales Data for Plaintiff's U.S. Market Trading Company Does Not Fill the Gap Created by Deficient Responses .................................................................... 19

B. Commerce Lawfully Applied a Partial Adverse Inference Because Plaintiff's Non-Answers Were a Failure to Act to the Best of Its Ability .................................... 21

CONCLUSION........................................................................................................................ 23

**Table of Authorities**

Page(s)

Statute

5 U.S.C. § 706 ........ 6

19 U.S.C. § 1516a(b)(1)(B) ........ 6

19 U.S.C. § 1667m(e)(3) ........ 20

19 U.S.C. 1677(33)(G) ........ *passim*

19 U.S.C. § 1677(35) ........ 17

19 U.S.C. § 1677e(b)(2)(D) ........ 20

19 U.S.C. § 1677b(a) ........ 17

19 U.S.C. § 1677e(a) ........ 4

19 U.S.C. § 1677e(a)(2) ........ 17

19 U.S.C. § 1677e(b) ........ 5, 7, 21, 22

19 U.S.C. § 1677e(b)(1) ........ 21

19 U.S.C. § 1677m(d) ........ 19

28 U.S.C. § 2640(b) ........ 6

Regulations

19 C.F.R. § 351.102(b)(3) ........ 9

19 C.F.R. § 351.403 ........ 18

Court Decisions

*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ........ 6

*Bio-Lab, Inc. v. United States*, 433 F. Supp. 3d 1287 (Ct. Int'l Trade 2020) ........ 8

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367 (Fed. Cir. 2021) ........ 9

*Cleo Inc. v. United States*, 501 F.3d 1291 (Fed. Cir. 2007) ........ 9

*Consol. Edison Corp. v. NLRB*, 305 U.S. 197 (1938) ........ 6

*Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607 (1966) .......... 16

*Dalian Hualing Wood Co., Ltd. v. United States,* 675 F. Supp. 3d 1294 (Ct. Int'l Trade 2023) .......... 16

*Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) .......... 22

*Kawasaki Steel Corp. v. United States*, 110 F. Supp. 2d 1029 (Ct. Int'l Trade 2000) .......... 22

*Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .......... 6

*Mueller Comercial De Mexico v. United States*, 753 F.3d 1227 (Fed. Cir. 2014) .......... 22

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .......... *passim*

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) .......... 19, 21

*QVD Food Co. v. United States,* 658 F.3d 1318 (Fed. Cir. 2011) .......... 23

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009) .......... 6

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .......... 6, 15

<u>Administrative Determinations</u>

*Certain Hot-Rolled Flat-Rolled Carbon Quality Steel Products from Brazil: Final Results of Antidumping Duty Administrative Review and Termination of the Suspension Agreement*, 67 Fed. Reg. 6,226 (Feb. 11, 2002) .......... 9

*Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 57,715 (Dec. 7, 2017) .......... 8

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8,641 (Feb. 8, 2024) .......... 2

*Non-Oriented Electrical Steel from Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 59,501 (Dec. 19, 2025) .......... 1, 5, 6

*Non-Oriented Electrical Steel from Japan: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 15,447 (Apr. 11, 2025) .......... 4

*Notice of Final Determination of Sales at Less Than Fair Value: Engineered Process Gas Turbo-Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan*, 62 Fed. Reg. 24,394 (May 5, 1997) ....................8

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, United States Steel Corporation (hereinafter "Defendant-Intervenor"), respectfully submit the following memorandum of law and fact in opposition to Plaintiff Nippon Steel Corporation's ("NSC" or "Plaintiff") Motion for Judgment on the Agency Record and ask that the Court deny Plaintiff's motion and sustain the challenged administrative determination.

## STATEMENT PURSUANT TO RULE 56.2

### I. Administrative Determination Under Review

Plaintiff contests the U.S. Department of Commerce's ("Commerce") final determination in the 2022-2023 administrative review of the antidumping duty order on non-oriented electrical steel ("NOES") from Japan. *Non-Oriented Electrical Steel from Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 59,501 (Dep't of Commerce Dec. 19, 2025) (P.R. 175), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 174) (together collectively with all analysis memoranda, the "*Final Results*").

### II. Issues Presented

1. When Congress included in the statutory definition of affiliated parties "any person who controls any other person and such other person," 19 U.S.C. § 1677(33)(G), and Commerce applied its well-established seven factor analysis to find that Plaintiff set key sales terms, interacted directly with the end customer, marketed directly to the end customer, appeared on sales documentation, and arranged all physical processing prior to sale did Commerce support its affiliation finding between Plaintiff and the trading companies under a principal-agent relationship with substantial evidence? Yes.

2. Because the antidumping statute allows Commerce to fill gaps on the record with adverse inferences due to a failure by an interested party to cooperate to the best of its

ability, and because Plaintiff did not provide Commerce with necessary information requested concerning home market and U.S. sales through trading companies despite having the control to do so, did Commerce lawfully exercise its discretion to calculate an antidumping duty margin using such partial adverse inferences? Yes.

**III. Request for Relief**

Defendant-Intervenor requests that the Court deny Plaintiff's motion and sustain Commerce's *Final Results* in all challenge respects.

## STATEMENT OF FACTS

On February 8, 2024, Commerce initiated the challenged administrative review on non-oriented electrical steel ("NOES") from Japan. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 8,641 (Dep't of Commerce Feb. 8, 2024). On April 1, 2024, Commerce issued its initial questionnaire to Plaintiff, the sole mandatory respondent. Commerce's Letter, "Request for Information" (Apr. 1, 2024) (P.R. 22).

Plaintiff's response to the initial questionnaire did not identify the trading companies at issue and did not provide complete home market and U.S. sales information relating to the sales of subject merchandise and the foreign like product by these companies. *See* NSC's Letters, "NSC's Response to the Department's Section A Questionnaire" (Apr. 29, 2024) ("AQR") (C.R. 9-23); "NSC's Response to the Department's Section B Questionnaire" (May 30, 2024) ("BQR") (C.R. 25-36); "NSC's Response to the Department's Section C Questionnaire" (May 30, 2024) ("CQR") (C.R. 37-42); NSC's Response to the Department's Section D Questionnaire" (May 30, 2024) ("DQR") (C.R. 43-70). Specifically, Plaintiff did not identify [

] ("the trading companies") as affiliates.

Commerce issued supplemental questionnaires to Plaintiff requesting additional information about its relationships with and sales of subject merchandise through trading companies. Commerce's Letters, "Supplemental Questionnaire (Dec. 13, 2024) ("Dec. 13 Supp Questionnaire") (C.R. 175); "Request for Information" (Feb. 13, 2025) ("Feb. 13 Supp Questionnaire") (C.R. 181). Specifically, Commerce requested:

> In the event {Commerce} find{s} that the relationship between NSC and its unaffiliated trading companies warrant different treatment, please provide a separate home market sales database in which, 1) for sales through affiliated trading companies, NSC continues to report the sale invoiced by the affiliated trading company to the unaffiliated home market customer, and 2) for sales through unaffiliated trading companies, NSC reports the sale invoiced by the unaffiliated trading company to the unaffiliated home market customer.

Dec. 13 Supp Questionnaire at 4.

Commerce also requested that

> NSC address and send the attached cover letter and sections B and C of the questionnaire directly to the 'unaffiliated' trading companies listed below in order for them to respond to the applicable requests in the questionnaires. {Commerce} also requests{s} that NSC provide the 'unaffiliated' trading companies with the relevant general instructions from the questionnaire that Commerce issued to NSC on April 1, 2024, and identify for the 'unaffiliated' trading companies the specific portions of sections B and C of the questionnaire for which the companies must supply information based on Commerce's December 13, 2024, supplemental questionnaire.

Feb. 13 Supp Questionnaire at 1.

Plaintiff submitted responses to Commerce's supplemental questionnaires; yet, the responses omitted pertinent information requested by Commerce. *See* NSC's Letters, "NSC's Response to the Department's December 13 Supplemental Questionnaire" (Jan. 10, 2025) ("Dec. 13 SQR") (C.R. 176-178); "NSC's Response to the Department's February 13 Request for Information" (Mar. 3, 2025) ("Feb. 13 SQR1") (C.R. 183); "NSC's Second Response to the Department's February 13 Request for Information" (Mar. 6, 2025) ("Feb. 13 SQR2") (C.R. 185-186). With respect to sales information from the trading companies, Plaintiff reported that the

trading companies refused to provide information. Dec. 13 SQR at SQR2-3, SQR2-6. One trading company involved in Plaintiff's U.S. sales provided limited sales information but did not provide a narrative response despite Commerce's instructions. Feb. 13 SQR2 at Exhibit RFI-8.

Commerce preliminarily found that Plaintiff was affiliated with the trading companies through a principal-agent relationship pursuant to 19 U.S.C. § 1677(33)(G). *Non-Oriented Electrical Steel from Japan: Preliminary Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 15,447 (Dep't of Commerce Apr. 11, 2025) (P.R. 149), and accompanying Preliminary Decision Memorandum ("PDM") (P.R. 148) and Preliminary Analysis Memorandum (C.R. 203). To do so, Commerce applied its well-established analytical framework for finding a principal-agent relationship, including an assessment of the following factors: (1) the foreign producer's role in negotiating price and other terms of sale; (2) the extent of the foreign producer's interaction with the customer; (3) whether the agent/reseller maintains inventory; (4) whether the agent/reseller takes title to the merchandise and bears the risk of loss; (5) whether the agent/reseller further processes or otherwise adds value to the merchandise; (6) the means of marketing a product by the producer to the end customer in the pre-sale period; and (7) whether the identity of the producer on sales documentation inferred such an agency relationship during the sales transaction. PDM at 4; Preliminary Analysis Memorandum (citations omitted). On balance, it found that despite the trading companies taking title to the goods, each of the other six factors weighed in favor of finding a principal-agent relationship. *See* Preliminary Analysis Memorandum.

After making this affiliation finding, and consistent with the mandate of 19 U.S.C. § 1677e(a), Commerce resorted to facts otherwise available to fill the gap created by Plaintiff's failure to provide requested information regarding Plaintiff's sales of NOES through trading

companies. PDM at 5-10. Specifically, Commerce found that the record lacked information regarding home market sales through trading companies and the trading company involved in U.S. sales. *See id.* Although some limited sales information had been provided, Plaintiff failed to meaningfully explain that information, rendering it unreliable. *Id.* Furthermore, consistent with the standards of 19 U.S.C. § 1677e(b) and *Nippon Steel*, Commerce applied an adverse inference because Plaintiff's omission reflected a failure to act to the best of its ability in providing requested information. *See id.*; *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).

In the *Final Results*, Commerce continued to find Plaintiff affiliated with the trading companies, disagreeing with Plaintiff's contention that the evidence did not demonstrate Plaintiff had control over the trading companies. *Non-Oriented Electrical Steel from Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. 59,501 (Dep't of Commerce Dec. 19, 2025) (P.R. 175), and accompanying IDM (P.R. 174). Commerce continued to recognize the gap in the administrative record and, furthermore, continued to apply AFA. *See id.* However, Commerce modified its adverse inference applying partial AFA to tailor its use of AFA to the facts of this case. *Id.* To fill in these gaps, as partial AFA, Commerce applied the highest home market gross unit price corresponding to the product control number with the largest quantity of home market sales to all of Plaintiff's home market sales made through the trading companies. IDM at Comment 3. Additionally, for Plaintiff's U.S. sales, Commerce applied the lowest gross unit price among the U.S. sales that Plaintiff reported through the trading companies in its initial questionnaire response to all Plaintiff's U.S. sales. IDM at Comment 3. In applying partial AFA, Commerce calculated an antidumping rate of 47.80

percent. *Non-Oriented Electrical Steel from Japan: Final Results of Antidumping Duty Administrative Review; 2022-2023*, 90 Fed. Reg. at 59,502.

Plaintiff now challenges Commerce's affiliation finding and decision to apply partial AFA.

## STANDARD OF REVIEW

In reviewing Commerce's antidumping duty determinations, this Court will hold Commerce's determination unlawful if it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B); *see also* 28 U.S.C. § 2640(b); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009) (citing 5 U.S.C. § 706). To determine whether substantial evidence supports the agency's decision, the Court examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Corp. v. NLRB*, 305 U.S. 197, 229 (1938)).

Substantial evidence is "more than a scintilla" and "must take into account whatever in the record fairly detracts from its weight." *Id.* at 477, 488. In sum, substantial evidence review requires the Court to determine whether the evidence and reasonable, evidence based inferences support Commerce's findings. *See Matsushita Elec. Indus. Co. Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Hence, this Court will affirm Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

## ARGUMENT

Commerce's finding that a principal-agent relationship existed between Plaintiff and certain trading companies is supported by substantial evidence and otherwise in accordance 19

U.S.C. § 1677(33)(G). Commerce determined Plaintiff was in a position to exercise restraint or discretion over its home market trading companies. Commerce reasonably concluded that the totality of the evidence on the record demonstrated that the independent trading companies were not independent resellers of Plaintiff's NOES. Plaintiff does not contest the analysis Commerce applied, but rather requests that the Court reweigh the probative evidentiary value that Commerce considered for each factor. Specifically, despite evidence that Plaintiff set key sales terms, interacted directly with the end customer, marketed directly to the end customer, appeared on sales documentation, and arranged all physical processing prior to sale, Plaintiff asks the Court to elevate other facts. As an affiliation determination is a fact-specific inquiry, Plaintiff's request for the Court to reach a different conclusion is contrary to the standard of review. (**Section I**).

Under the circumstances presented in which Plaintiff failed to supply necessary information from its affiliated trading companies, the statute required Commerce to resort to partial facts otherwise available. Because Plaintiff did not act to the best of its ability in attempting to provide this information, Commerce's tailored application of partial AFA is supported by substantial evidence and consistent with the standards of 19 U.S.C. § 1677e(b) and *Nippon Steel*. The Court should sustain Commerce's determination because limiting Commerce's ability to apply an adverse inference in the circumstances presented would permit respondents to manipulate Commerce's margin calculations by withholding key information. (**Section II**).

## I. Commerce's Finding That a Principal-Agent Relationship Existed Between Plaintiff and Its Home Market Trading Companies Is Supported by Substantial Evidence

Commerce's finding that Plaintiff is affiliated with its home market trading companies is lawful and supported by substantial evidence. Pursuant to 19 U.S.C. § 1677(33)(G), Commerce

finds parties to be affiliated when a principal-agent relationship exists—even where the principal and agent in the sales transaction are unrelated in a broader corporate sense. *See Diffusion-Annealed, Nickel-Plated Flat-Rolled Steel Products from Japan: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 82 Fed. Reg. 57,715 (Dep't of Commerce Dec. 7, 2017) ("*DANP from Japan*"), and accompanying IDM at Comment 1; *Notice of Final Determination of Sales at Less Than Fair Value: Engineered Process Gas Turbo-Compressor Systems, Whether Assembled or Unassembled, and Whether Complete or Incomplete, from Japan*, 62 Fed. Reg. 24,394, 24,400-03 (Dep't of Commerce May 5, 1997) ("*Gas Turbo Compressor Systems from Japan*").

Absent an explicit agency agreement, Commerce's practice for identifying a *de facto* agency relationship examines factors such as: (1) the foreign producer's role in negotiating price and other terms of sale; (2) the extent of the foreign producer's interaction with the end customer; (3) whether the agent/reseller maintains inventory; (4) whether the agent/reseller further processes or otherwise adds value to the merchandise; (5) the means of marketing a product by the producer to the end customer in the pre-sale period; (6) whether the identity of the producer on sales documentation infers such an agency relationship during the sales transaction; and (7) whether the agent/reseller takes title to the merchandise and bears the risk of loss. *DANP from Japan* IDM at Comment 1; *Bio-Lab, Inc. v. United States*, 433 F. Supp. 3d 1287, 1292-97 (Ct. Int'l Trade 2020) (sustaining Commerce's application of this seven factor analysis for determining principal-agent relationship). Finding parties affiliated based on the principal-agent relationship is sufficient and does not require a second basis for finding affiliation.

Commerce's analysis turns on whether the foreign producer "was in a position to exercise restraint or direction over the trading company in question for the sales at issue." *Certain Hot-*

*Rolled Flat-Rolled Carbon Quality Steel Products from Brazil: Final Results of Antidumping Duty Administrative Review and Termination of the Suspension Agreement*, 67 Fed. Reg. 6,226 (Dep't of Commerce Feb. 11, 2002) ("*HRS from Brazil*"), and accompanying IDM at Comment 1. The principal's capacity to control must carry the potential to impact the agent's production, pricing, or cost decisions. 19 C.F.R. § 351.102(b)(3). Here, given the principal-agent relationship, such control existed over the sales transactions at issue.

A finding of affiliation based on the principal-agent relationship is the result of Commerce weighing record evidence. If Commerce has identified substantial evidentiary support for its finding, this Court's standard of review does not allow it to re-weigh the evidence or second-guess Commerce's analysis of such fact-intensive questions. *See, e.g.*, *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) ("{S}imply because the reviewing court would have reached a different conclusion based on the same record" does not mean the decision is not supported by substantial evidence); *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374 (Fed. Cir. 2021) (stating the court affords "tremendous deference" to Commerce's administration of its antidumping law; thus, factual determinations supporting antidumping margins are "best left to the agency's expertise" (citations omitted)). Commerce faithfully considered these factors with respect to Plaintiff and its trading companies and identified substantial record evidence of a principal-agency relationship.

**A. Commerce Identified Ample Record Evidence of a *De Facto* Agency Relationship**

Based on its evaluation of each of the seven factors, identified above, Commerce determined Plaintiff and the trading companies are affiliated. Commerce determined the record demonstrated the trading companies acted to benefit Plaintiff and facilitate its sales rather than independently act as a reseller of Plaintiff's NOES. IDM at Comment 1.

1. *Plaintiff plays a key role in negotiating price and other terms of sale, which binds the trading companies to such terms*

Commerce properly determined Plaintiff controlled the price and terms of sale to end customers. IDM at Comment 1. Plaintiff stated that it plays the primary role in negotiating price and other terms of sale with the end home market customers, even when sales are made through "unaffiliated" trading companies. In [ ] of its home market sales, "NSC negotiates the FOB price along with all other terms of sale of the slitted NOES coil with the end customer." AQR at A-23. Therefore, the trading companies have little ability to renegotiate prices with the end customer because [ ]. AQR at A-29. Additionally, Plaintiff stated that it – and not the trading companies – negotiated rebates with certain home market customers. "NSC's Response to the Department's Section B Supplemental Questionnaire" (Sept. 23, 2024) ("BSQR") (C.R. 101-136) at BSQR-22. For home market sales in channels 1 and 2, "NSC is the actual selling party" because "NSC negotiates the price and terms of sale with the end customer." BQR at B-43. The trading companies lacked any authority on key selling terms.

2. *Plaintiff has extensive interactions with the end customer*

Commerce correctly determined Plaintiff had significant interactions with end customer further finding the trading companies played a support role. IDM at Comment 1. Plaintiff is extensively involved in transactions with the end customers for [ ] of its home market sales including negotiating the final delivered price of the NOES directly with the end customer. BSQR at BSQR3-2. Plaintiff unambiguously stated it "is very involved in the sales process" regardless of whether the sale is made through an affiliated or "unaffiliated" trading company. AQR at A-18; Exhibit A-10. In particular, Plaintiff admits that "{i}n the vast majority of sales, NSC directly negotiates with end-customers to decide on the NOES specifications, quantities,

prices, supply chains, and logistics." AQR at A-18. Plaintiff indicated it needed to be involved in the sales process with end customer because NOES products are customer specific and tied to the end use of the steel. BSQR at BSQR-12. Therefore, the trading companies were just a conduit, or agent, for making the sales at issue.

3. *Plaintiff is involved in marketing NOES to end customers in the pre-sale period*

Commerce reasonably concluded Plaintiff is materially involved in marketing and selling products to the end customers. IDM at Comment 1. In terms of marketing its NOES products, Plaintiff reported that it provides materials "to promote and better inform purchasing activities of NOES end customers," creates product brochures, provides "technical advice or explanations regarding its products when proposing future business opportunities to end customers," "meet{s} the end customer to provide advice" when "an end customer encounters an issue or requests technical advice regarding the use of an NSC product," and coordinates with the trading companies to "predict{} production trends for each end customer and develop{} monthly sales plans given NOES production lead times and inventory." AQR at A-34, A-19; NSC's Letter, "NSC's Response to the Department's Section A Supplemental Questionnaire" (Aug. 8, 2024) ("ASQR") (C.R. 75-87) at ASQR-12.

Plaintiff's selling activities chart [ ] pre-sale activities, including "develop{ing} sales strategy," "provid{ing} information on market potential and competitors," "provid{ing} customers with advice regarding steel grades/specifications," and providing "technical advice regarding use of product." ASQR at ASQR-10 to ASQR-12, Revised Exhibit A-10. In "Sales Through Trading Company (NSC negotiate With customer)," Plaintiff reports its level of selling activity as [ ]. ASQR at ASQR-10,

Revised Exhibit A-10 ([ ]). The trading companies have little to no activity in marketing the products to end customers.

4. *Sales documentation makes clear Plaintiff's chief role in the sales transaction and that the trading companies played a supporting role*

Commerce correctly determined the record evidence demonstrated Plaintiff negotiated delivered prices for home market sales and Japan port prices for U.S. sales, which included prices for slitting coils. IDM at Comment 1. As noted, Plaintiff negotiated the final, delivered price with the end customer for all home market Channel 1 and 2 sales, *i.e.*, sales through trading companies. *See* Section I.A.1, *supra*. Consequently, even when end customers in these sales channels interface with the trading companies, the customer is necessarily aware that the transaction does not occur independent of Plaintiff. Commerce therefore asked whether Plaintiff is explicitly identified in the sales documentation that the trading company issues when selling NOES produced by Plaintiff to end users. *See* NSC's Letter, "NSC's Response to the Department's Supplemental Questionnaire" (Dec. 16, 2024) ("Dec. 16, 2024 SQR") (C.R. 172-174) at SQR-10. Plaintiff responded that it expected trading company sales documentation to identify Plaintiff's product specifications. *See* Dec. 16, 2024 SQR at SQR-10 (Plaintiff "would not be surprised if the trading companies listed an NSC specification somewhere on such documentation because {it} would expect that the end customers would like to know the exact NOES merchandise they are buying.").

Moreover, given that Plaintiff itself negotiated the key sales terms, *see* Section I.A.1, *supra*, trading companies issued limited documentation. For example, Plaintiff provided sales documentation between reportedly unaffiliated trading company [ ] and the end customer for NOES sales reflected in SEQHs [ ]. Dec. 16, 2024 SQR at Exhibit SQR-3. For each sale [ ] "used [

] as its invoice." Dec. 16, 2024 SQR at SQR-11. The fact that [ ] sales invoice reflects the principal-agent relationship wherein [ ].

5. *Home market trading companies do not process or otherwise add value to the merchandise beyond what Plaintiff pre-arranged*

Commerce reasonably found the trading companies did not directly or independently further process or add value to the NOES coils but implemented further processing arranged by Plaintiff at the cost which was approved by Plaintiff. IDM at Comment 1. For home market sales in channel 1, Plaintiff produces the merchandise and there is no indication that trading companies coordinate or perform any additional processing. AQR at A-23, A-26, Exhibit A-8, Exhibit A-11. For home market sales in channel 2, Plaintiff again produces the merchandise and, even where the relevant trading company "engages service centers for slitting and will negotiate the slitting fee with the service center," such allegedly external "negotiations" between the trading company and service center are ultimately controlled by Plaintiff. *See* AQR at A-24-A-25; BSQR at BSQR-16. The negotiated slitting costs must be deemed "acceptable to {Plaintiff}" prior to the time of sale. *Id.* Stated differently, Plaintiff does not allow deviation from prices and terms of sale, further evidencing its control over the trading companies.

Despite the trading companies' functionally nonexistent processing role, Plaintiff nevertheless claims that trading companies "added value" to the merchandise by "contribut{ing} to the overall business through inventory management, just-in-time delivery functions, and bearing the risk of loss for NOES held in inventory." Dec. 16, 2024 SQR at SQR-9. But Commerce's principal-agent analysis focuses on value added through physical changes to the merchandise and not intrinsic value-add that might make the principal's job easier. This makes

sense as an agent is hired to make the principal's work more efficient for the principal; this does not indicate a lack of control over the transactions at issue, however.

6. *Trading companies maintained inventory for Plaintiff's benefit*

Commerce properly found the trading companies maintained inventory to facilitate Plaintiff's sales to end customers. IDM at Comment 1. The trading companies maintain inventory according to Plaintiff's planning decisions. As Plaintiff explained, it predicts production trends for its end customer and develops monthly sales plans given inventory. AQR at A-19. Commerce explained that because NOES is not a "commodity product" but rather made for specific customer specifications that the trading companies' inventory was to facilitate Plaintiff's sales. IDM at Comment 1. Again, Commerce reasonably weighed the evidence to find that the trading companies merely acted as agents to facilitate transactions to the principal's benefit.

7. *Trading companies took title and bore risk of loss for Plaintiff's benefit*

Commerce correctly assessed that the record proved that trading companies took title and bore risk of loss for Plaintiff's benefit. IDM at Comment 1. Plaintiff stated multiple times that the trading companies bore the risk of loss to reduce its own liability. ASQR at ASQR-25; Dec. 16, 2024 SQR at SQR-9. Taking title was merely a conduit for the trading companies to better support the principal and thus, also supports Commerce's conclusion. This is not the type of circumstance in which taking title indicates that the agent can do anything with the merchandise; rather, the agent is bound by the principal's direction regardless of bearing risk of loss.

* * * *

In evaluating the factors as a whole, Commerce reasonably determined Plaintiff acted as the principal with the trading companies acting as an agent only for Plaintiff's benefit in the subject transactions.

**B. Plaintiff Identifies No Record Evidence to Compel a Contrary Conclusion, and the Court Should Reject Plaintiff's Invitation to Re-Weigh the Evidence as Contrary to the Substantial Evidence Standard of Review**

Without disputing the legal test applied and the above-described facts that support Commerce's *de facto* agency relationship finding, Plaintiff focuses exclusively on the fact that the trading companies take title to the merchandise at the time of purchase from Plaintiff and keep NOES produced by Plaintiff in inventory during the POR "in order to handle delivery to the end customers and manage their own inventory of NOES after sale and shipment from NSC to meet customers' demand." Dec. 16, 2024 SQR at SQR-6 and SQR-9; *see* Pl. Br. at 19-20. As discussed, Commerce acknowledged and considered these factors administratively, *see* Preliminary Analysis Memo; IDM at Comment 1, but ultimately concluded that the totality of the evidence on the record demonstrated that the trading companies were not independent resellers of Plaintiff's NOES, IDM at Comment 1. Commerce did not overlook record evidence, and its conclusion was supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*, 340 U.S. at 477. Specifically, Plaintiff set key sales terms, interacted directly with the end customer, marketed directly to the end customer, appeared on sales documentation, and arranged all physical processing prior to sale. *See* Section I.A, *supra*. Taken together, and with the fact that Plaintiff reported that the trading companies took title to reduce its liability, such action is reasonably interpreted as an action of an agent acting on behalf of a principal. This is a reasonable conclusion given the control that Plaintiff possessed over the entirety of the transaction.

Purporting to step into Commerce's shoes, Plaintiff contends that these facts do not support Commerce's affiliation determination, citing various examples in other administrative matters in which Commerce reached a different conclusion. Pl. Br. at 13-15. Commerce's administrative determinations stand on their own record, and Commerce must evaluate the

particular facts of each case to support the conclusions reached. *Dalian Hualing Wood Co., Ltd. v. United States*, 675 F. Supp. 3d 1294, 1301 (Ct. Int'l Trade 2023).

In evaluating the record here, Commerce specifically identified the differences between the cases Plaintiff raised and the facts present. IDM at 14. Commerce further highlights the differences between these administrative matters in its brief, which Defendant-Intervenor herein incorporate. *See* Defendant's Response in Opposition to Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record (ECF 40) at 26-30. Based on the record of this administrative review, Commerce reasonably found a principal-agent relationship such that Plaintiff and the trading companies were affiliated for antidumping purposes.

The mere possibility of drawing inconsistent conclusions from the record does not render Commerce's finding unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

## II. Commerce's Application of Partial Adverse Facts Available Is Supported by Substantial Evidence And Is Otherwise in Accordance with Law

Commerce properly applied partial facts available with an adverse inference. Due to Plaintiff's deficient reporting, there is a gap in the administrative record thus warranting Commerce apply partial facts available to make the record whole. Because Plaintiff failed to respond to certain questions issued by Commerce, adverse inferences are justified.

### A. Commerce Reasonably Found a Gap in the Administrative Record When Plaintiff Failed to Answer Commerce's Requests for Information

By statute, Commerce shall rely upon facts otherwise available to fill gaps in the record if an interested party: (1) withholds information that has been requested, (2) fails to provide requested information by the deadlines established, or in the form and manner requested, (3) significantly impedes the proceeding, or (4) provides information that cannot be verified. 19 U.S.C. § 1677e(a)(2). The "mere failure of a respondent to furnish requested information — for

any reason — requires Commerce to resort to other sources of information to complete the factual record on which it makes a determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003). Indeed, "the focus of {1677e(a)(2)} is a respondent's failure to provide information. The reason for the failure is of no moment." *Id.*

Here, Commerce reasonably determined necessary data are missing from the record. IDM at Comment 2. The antidumping duty is calculated by comparing U.S. price against home market prices to identify U.S. prices that are dumped, *i.e.*, below home market prices. 19 U.S.C. § 1677b(a); 19 U.S.C. § 1677(35). Home market prices serve as a comparison against which U.S. prices are compared. *See* 19 U.S.C. § 1677b(a) (requiring a "fair comparison" using home market prices made in the "ordinary course of trade"). Allowing a respondent to omit all high home market prices—will allow the respondent to mask or eliminate their dumping. To avoid this manipulation, Commerce instructed Plaintiff to report data for **all** home market sales of NOES, including data for home market sales sold by Plaintiff through trading companies to end customers.

1. *Plaintiff Failed to Report Sales Through Trading Companies*

As an initial matter, Plaintiff appears to conflate (A) the price at which Plaintiff sold NOES to affiliated trading companies with (B) the price at which unaffiliated end customers purchased Plaintiff's NOES through affiliated trading companies. The two are distinct. If Plaintiff and the trading company are affiliated as Commerce found, then Commerce must undertake a separate assessment to determine whether pricing between the two entities is at arm's length. *See* 19 C.F.R. § 351.403. If such pricing is not at arm's length, Commerce will instead treat the price at which the end customer purchased Plaintiff's NOES as the home market sales price. *See* 19 C.F.R. § 351.403. Commerce must therefore know **both** prices ((A) & (B)) to perform the dumping analysis. Here, however, Commerce properly found that Plaintiff failed to

provide home market sales data for sales invoiced by the trading companies to unaffiliated end customers, *i.e.*, price (B), resulting in a gap in the record. IDM at Comment 2.

Plaintiff contends Commerce did not request information regarding the trading companies' home market sales. Pl. Br. at 26. Consistent with Commerce's standard practice, its initial Section B questionnaire requested information regarding home market sales through affiliated parties. *See* Commerce's Letter, "Request for Information" (Apr. 1, 2024) (P.R. 22) at B-2-B-3. Moreover, in a supplemental questionnaire Commerce specifically requested information regarding the trading companies:

> In the event {Commerce} find{s} that the relationship between NSC and its unaffiliated trading companies warrant different treatment, please provide a *separate* home market sales database in which, 1) for sales through affiliated trading companies, NSC continues to **report the sale invoiced by the affiliated trading company to the unaffiliated home market customer**, **and** 2) for sales through unaffiliated trading companies, **NSC reports the sale invoiced by the unaffiliated trading company to the unaffiliated home market customer**.

Dec. 13 Supp Questionnaire at 4 (emphasis supplied).

Plaintiff's response to Commerce's questionnaire failed to provide **any** sales information regarding any of the trading companies at issue. Plaintiff specifically indicated the "trading companies refused to provide this information" indicating this information would not be forthcoming. Dec. 13 SQR at SQR2-3 and SQR2-6. Commerce accepted the premise that information might not be submitted by the trading companies through Plaintiff and issued another supplemental questionnaire specifically requesting that:

> NSC address and send the attached cover letter and sections B and C of the questionnaire directly to the 'unaffiliated' trading companies listed below **in order for them to respond to the applicable requests in the questionnaires**. {Commerce} also requests{s} that NSC provide the 'unaffiliated' trading companies with the relevant general instructions from the questionnaire that Commerce issued to NSC on April 1, 2024, and identify for the 'unaffiliated' trading companies the specific portions of sections B and C of the questionnaire for which the companies must supply information based on Commerce's December 13, 2024, supplemental questionnaire.

Feb. 12 Supp Questionnaire at 1. Plaintiff placed its communications with the trading companies on the record, but failed to provide any additional information concerning how Plaintiff followed Commerce's request. Feb. 13 SQR1 and Feb. 13 SQR2. No further information was forthcoming.

Plaintiff argues that it was owed some further notice of the deficiency in its responses. Pl. Br. at 27-29. This is not the statutory standard, which requires only that Commerce, "to the extent practicable, provide…**an opportunity** to remedy or explain the deficiency in light of the time limits established for the completion of…reviews…." 19 U.S.C. § 1677m(d) (emphasis supplied). Commerce did so here. *See* Dec. 13 Supp Questionnaire; Feb. 13 Supp Questionnaire.

Moreover, Commerce's finding would have been lawful even if it had never provided Plaintiff an opportunity to remedy the deficiency insofar as Plaintiff failed to provide to provide **any** responsive information. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002) (emphasis supplied) (stating 19 U.S.C. § 1677m(d) only applies when a response is not compliant and a failure to respond is not the same as a response therefore, Commerce does not have a statutory duty to tell a respondent that its failure to respond is deficient). At some point, Commerce must be able to accept that a respondent is not going to provide an answer to a question it is asked.

2. *Sales Data for Plaintiff's U.S. Market Trading Company Does Not Fill the Gap Created by Deficient Responses*

Plaintiff argues that Commerce <u>should</u> have found no gap in its sales files because Plaintiff reported sales data for a U.S. market trading company. Pl. Br. at 27-30. The record evidence and statute, however, confirm that Commerce properly filled the gap in the record. *First*, U.S. sales data cannot cure for the above-described gap in Plaintiff's home market sales

data. Commerce's dumping analysis is, fundamentally, an exercise in comparing U.S. prices against home market prices. *See* Section II.A, *supra*. Treating U.S. prices as the comparison price would make the analysis circular.

*Second*, as Commerce recognized, the U.S. trading company's sales data were so incomplete such that it could not serve as a reliable basis for reaching the applicable determination. 19 U.S.C. § 1667m(e)(3); IDM at Comment 2. Specifically, Plaintiff's response omitted all narrative explanations requested by Commerce. Feb. 13 SQR2 at Exhibit RFI-8. Without the narrative explanations, the record lacked information critical to understanding and evaluating the data provided. Commerce therefore declined to rely on the data provided. IDM at Comment 2.

Plaintiff observes that Commerce used some of the U.S. market trading company's sales data in applying an adverse inference and argues that Commerce should, therefore, be required to use the whole of the U.S. market trading company's sales data. Pl. Br. at 30. However, the statute provides Commerce can rely on "any other information placed on the record" when applying adverse inferences. 19 U.S.C. § 1677e(b)(2)(D). Doing so does not oblige Commerce to use that information for other purposes. Indeed, the statute uses the term inference, and Commerce did just that – infer.

Finally, Plaintiff again argues that it was due some additional opportunity to remedy or explain this deficiency. Pl. Br. at 29-30. Where a respondent fails to provide a response altogether, as is the case here, Commerce is not required to provide an opportunity to remedy the deficiency. *See Ta Chen*, 298 F.3d at 1338.

Commerce appropriately declined to treat the U.S. market trading company's database as filling the gap in the record with respect to home market trading company sales data.

### B. Commerce Lawfully Applied a Partial Adverse Inference Because Plaintiff's Non-Answers Were a Failure to Act to the Best of Its Ability

If Commerce determines "that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information," it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1). *Nippon Steel* confirms that the "best of its ability" standard requires a respondent to "do the maximum it is able to do" and "put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1381-82 (quoting 19 U.S.C. § 1677e(b)). The "best of its ability" standard does not "condone inattentiveness, carelessness, or inadequate record keeping." *Id.* at 1382-83. Rather, it "assumes that importers"—and especially experienced, AD/CVD respondents like Plaintiff—"are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries. . . take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce." *Id.* Commerce reasonably employed a partial adverse inference when selecting from among the facts otherwise available on the record because Plaintiff did not act to the best of its ability when it omitted to report data for sales through affiliated trading companies to unaffiliated end customers.

Plaintiff focuses on the fact that some of the information at issue was in the possession of Plaintiff's affiliates, *see generally,* Pl. Br. at 21-26. But this is no barrier to Commerce's application of an adverse inference. As *Hyundai Steel* explained, an "assessment of whether {a respondent} 'put forth its maximum efforts to investigate and obtain the requested information from its records,' necessarily must assess whether {it} could or should have been able to obtain

the information in its affiliate's possession." *Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1345 (Ct. Int'l Trade 2018). Consistent with this, Commerce found here that Plaintiff should have been able to leverage its control over the trading companies' sales and business operations to obtain the necessary information. IDM at Comment 2; *see also* Section I.A, *supra* (describing Plaintiff's extensive control over the sales process).

This Court has otherwise upheld Commerce's general practice of attributing the failure of an affiliate to the respondent. *Kawasaki Steel Corp. v. United States*, 110 F. Supp. 2d 1029, 1038 (Ct. Int'l Trade 2000). The Federal Circuit has likewise sustained Commerce's application of AFA based on a respondent's decision to do business with third parties that refuse to provide the respondent with necessary data. *Mueller Comercial De Mexico v. United States*, 753 F.3d 1227, 1233-4 (Fed. Cir. 2014). Thus, Commerce's finding that Plaintiff did not act to the best of its ability to report its affiliated party data was reasonable, notwithstanding the role of affiliates.

Plaintiff argues that Commerce should be precluded from applying an adverse inference because Commerce did not identify the measures Plaintiff should have taken. Pl. Br. at 23-25. Plaintiff cites no authority for this position, *see id.* at 23-25, which finds no support in the statutory standard, *see* 19 U.S.C. § 1677e(b). Indeed, this argument impermissibly shifts the burden of developing the administrative record onto Commerce, contrary to Federal Circuit precedent. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (burden of creating an adequate record before Commerce lies with interested parties).

Commerce need only to determine that a respondent failed to cooperate by not acting to the best of its ability to apply an adverse inference. *See id.* Plaintiff—not Commerce—has the relationship with its affiliates and it is manifestly for Plaintiff—not Commerce—to determine how best to go about obtaining the information Commerce requests. Moreover, Plaintiff fails to

admit that Commerce **did** provide some guidance; indeed, Commerce explicitly stated that the trading companies could submit information directly to Commerce if the trading companies had confidentiality concerns and indicating that extensions were possible. *See* PDM at 9.

In sum, notwithstanding Commerce's repeated requests for information concerning home market sales through affiliated trading companies, Plaintiff failed to report such information. Moreover, the facts before Commerce reasonably demonstrated that Plaintiff's failure to provide complete and accurate responses amounted to a failure to the best of its ability. Plaintiff's carelessness and inattentiveness do not satisfy the "best of its ability" standard. *See Nippon Steel*, 337 F.3d at1382. Commerce's decision to apply an adverse inference was lawful and supported by substantial evidence, and should be sustained.

## CONCLUSION

For the reasons discussed above, this Court should sustain Commerce's *Final Results* in all challenged respects and deny Plaintiff's motion for judgment on the agency record.

Respectfully submitted,

James E. Ransdell
Thomas M. Beline
Shanni Alon
Margaret E. Monday
Nicole Brunda
CASSIDY LEVY KENT (USA) LLP
*Counsel for United States Steel Corporation*

November 24, 2026

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing response brief contains 6,761 words, exclusive of the table of contents, table of authorities, square braces ("[ ]"), any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature block and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By: /s/ James E. Ransdell
James E. Ransdell